**STATE**

v.

**Eric RANIERI.**

**No. 89–281–C.A.**

Supreme Court of Rhode Island.

March 1, 1991.

James E. O'Neil, Atty. Gen., Jeffrey Greer, Asst. Atty. Gen., and Annie Goldberg, Sp. Asst. Atty. Gen., for plaintiff.

Richard Casparian, Public Defender, and Paula Rosin and Barbara Hurst, Asst. Public Defenders, for defendant.

## OPINION

MURRAY, Justice.

Eric Ranieri (defendant or Ranieri) is appealing his convictions [1] for burglary and

---

1. The defendant was convicted after an eight-day jury trial. We undertook consideration of this case after careful examination of the 1,321 pages of transcript covering the trial and pre- and posttrial motions.

assault with a dangerous weapon. His several grounds on appeal are these: that the trial court should have suppressed in-court and out-of-court identifications by two witnesses; that the state improperly secreted exculpatory evidence; that the trial court improperly allowed into evidence a statement suggesting that the defendant had threatened a state's witness; and that the defendant's convictions are inconsistent. For the reasoning that follows, we accept some of the defendant's arguments and remand for a new trial.

At 4 a.m. on March 19, 1987, one Elsie M.[2] (Elsie) was awakened in her apartment by the sounds of someone breaking in. At the time, Elsie was seventy-three years old and lived alone. Her apartment was located on the first floor of a triple-decker tenement in North Providence. The door to her apartment entered into a front parlor. The parlor leads to the kitchen, which leads to Elsie's bedroom.

At that hour of the night, Elsie's apartment was dark. All the shades were drawn in the apartment, except for one in the parlor. Streetlighting and/or auto lights may have shown through the drawn shades or the unshaded window. Elsie testified that she generally kept a nightlight on (a small one that plugs directly into a socket) above her kitchen sink. Elsie stated with hesitant certainty that the night light was on on the night in question. However, the police and one William Picard testified that no light of any kind was on in the apartment.

Upon being awakened by the noise of her apartment being broken into, Elsie got up from her bed and made her way to the kitchen telephone. At the threshold leading from the bedroom to the kitchen, she was grabbed from behind by an assailant. Elsie screamed and struggled, and the assailant attempted to stuff a gag into her mouth. The assailant threw Elsie to the floor and struck her several times with a metal bar of some sort. Elsie testified that she passed out during the encounter, but she added that she remembered seeing defendant's face before she passed out and

that she remembered seeing it again after she was revived.

William Picard (Picard), Elsie's second-floor tenant of some twenty years, was awakened by these force-entry noises. He came downstairs to the first floor where he found Elsie's apartment door broken down. He testified that there were no lights on in the apartment but that he could make out the assailant in the kitchen striking Elsie. As he pulled the assailant away from Elsie, he saw the assailant's "upper lip" for a few seconds before the assailant struck him and escaped. When Picard testified at defendant's trial and at a pretrial suppression hearing, he said several times that he saw the assailant's upper lip for merely one to two seconds. At one point in the pretrial suppression hearing, he testified that he saw the upper lip from ten to sixty seconds. Picard testified further that after the assailant escaped, Elsie was disorientedly crying, "[W]ho was doing this to me?"

The phone lines to the building were cut so Picard ran outside and flagged down a passing patrol car. Both Picard and Elsie were taken to the hospital. Picard suffered a head injury requiring thirteen stiches. Elsie suffered life-threatening injuries which required immediate surgery. Thankfully, both victims survived the affair.

As Picard was taken from the building on a stretcher, a neighbor, Lisa, retrieved a photograph of her boyfriend (we shall identify this person as "Henry") from her home and provided it to the police as the possible assailant. Picard identified Henry as the assailant before being taken to the hospital. The police retained custody of this picture of Henry but lost it before defendant's trial. It is the loss of this picture that defendant says incurably prejudices defendant's identification defense. After Picard was released from the hospital later in the day, he went to the North Providence police department (police). He was unable to pick out Henry from a police lineup. Thereafter, Henry was not considered a suspect by the police.

2. A fictitious name.

Relying on sources other than Picard or Elsie, the police arrested Ranieri about a week after the crime. Ranieri is an eighteen-year old white male, five-foot-six, weighing 150 pounds. Ranieri on occasion visited the house adjacent to Elsie. Elsie believed Ranieri had been living next to her starting about a year before her assault. However, testimony at trial revealed that Ranieri lived elsewhere and that he visited Elsie's neighbor only occasionally.

The Providence Journal (Journal) reported Ranieri's arrest and published a picture of Ranieri on or about March 24, 1987. The Journal reportedly ran at least one subsequent article with Ranieri's photo. On April 11, 1987, about three weeks after the crime and a couple of weeks after the Journal report, Picard was asked to view a photo array containing defendant's picture. Picard successfully identified defendant as picture number 5 in this array. Elsie did not, at this time, make any kind of identification of defendant or of any other police suspects. Rather, Elsie steadfastly maintained for over eighteen months after the crime that she never saw her assailant. At no time did she provide a description of any kind to the police.

On the basis of Picard's photo-array identification and on other evidence, defendant's trial was set to proceed on September 13, 1988. At 2:30 p.m. on that date, the state asked for a continuance, stating that Elsie had suddenly come forward and offered to identify defendant as her assailant. The court granted the continuance over defendant's objection. The defendant's counsel pointedly requested that because of the late nature of Elsie's identification and because Elsie had previously insisted that she could not identify her assailant, he be present at any out-of-court identification by Elsie. The next day, without defense counsel's presence, a photo array was shown to Elsie, and she chose defendant, who appeared as picture number 5 in this array also.

3. The defendant does not muster a challenge under the Federal or State Constitutions on the basis that he has a right to have counsel present after the commencement of adversarial proceedings (that is, Sixth Amendment grounds),

## ELSIE IDENTIFICATION

■ The defendant challenges Elsie's out-of-court photo-array identification on the basis that he was denied due process because his counsel was not allowed to be present.[3] He further challenges the admission of Elsie's in and out-of-court identifications on the basis that Elsie was not a competent witness under Rule 602 of the Rhode Island Rules of Evidence (Rule 602) in that she had no personal knowledge of her assailant's identity because she had an insufficient opportunity to view the assailant. We are persuaded by his second argument.

The defendant fails to cite any federal or state authority for his due process argument because, quite frankly, it is a novel approach. The defendant contends that the state unconstitutionally deprived him (a postindictment defendant on the eve of trial) of his due process rights by failing to allow his attorney the opportunity to be present while last-minute evidence injurious to his liberty interest was being collected. We do not decide this interesting extension of due process rights. For purposes of this appeal, we are convinced that Elsie was not competent to identify her assailant because she had no personal knowledge of her assailant's identity as required by Rule 602. We think it evident that Elsie had a preformed opinion about defendant and is now unjustifiably accusing him.

■ In consideration of Ranieri's challenge, we note that he has not styled his legal argument as a Rule 602 competency question. He argues that Elsie's testimony is "unreliable" and that it should be suppressed because it should be likened to an expression of an opinion by a lay witness under Rule 701 of the Rhode Island Rules of Evidence. Reading defendant's argument in its totality, we think his argument

recognizing that there is no such right under the Federal and Rhode Island Constitutions. *United States v. Ash*, 413 U.S. 300, 93 S.Ct. 2568, 37 L.Ed.2d 619 (1973); *State v. Edwards*, 122 R.I. 228, 405 A.2d 1161 (1979).

really is an objection under Rule 602.[4] When a witness testifies to an identification of someone, that identification is not the expression of an opinion by a lay witness. Rather it is a statement of fact that the witness recognizes someone else.

Under Rule 602, "A witness may not testify to a matter unless evidence is introduced sufficient to support a finding that the witness has personal knowledge of the matter. Evidence to prove personal knowledge may, but need not, consist of the testimony of the witness himself or herself." If a witness lacks such personal knowledge, then the witness is deemed to be incompetent to testify with respect to that matter. *See* Rule 601.

■■■■■ In deciding whether a witness is competent for purposes of Rule 602, the trial justice must determine whether a witness had a sufficient opportunity to perceive the subject matter about which he is testifying. *See Hallquist v. Local 2765, Plumbers & Pipefitters Union,* 843 F.2d 18, 24 (1st Cir.1988); 3 J. Weinstein & M. Bergen, *Weinstein's Evidence* ¶ 602[02] at 602–12 (M.B.1988). The justice is not making a credibility determination and is not judging whether the witness is accurately and truthfully relating that which he perceived. *See* 3 J. Weinstein & M. Bergen, ¶ 602[02] at 602–10, 602–11 (citing *United States v. Smith,* 592 F.Supp. 424, 441 n. 22

(E.D.Va.1984), *rev'd on other grounds,* 780 F.2d 1102 (4th Cir. en banc 1985) (discussing distinction between F.R.E.Rule 602 and Doctrine of Inherent Incredibility)). Further, "Rule 602 * * * does not require that the witness' knowledge be positive or rise to the level of absolute certainty. Evidence is inadmissible under this rule only if in the proper exercise of the trial court's discretion it finds that the witness could not have actually perceived or observed that which he testifies to." *M.B.A.F.B. Federal Credit Union v. Cumis Insurance Society, Inc.,* 681 F.2d 930, 932 (4th Cir.1982).[5] In a situation in which the question of a witness's Rule 602 competency is close (that is, the jury could find that the witness perceived the matter testified to), the judge should admit the testimony since the matter then becomes one of credibility and is properly for the jury. *See* 3 J. Weinstein & M. Bergen, ¶ 602[02] at 602–11. Further, "[i]n a criminal case where the proponent is the defense, the court should hesitate even more than in other instances in excluding testimony on Rule 602 grounds." *Id.* at 602–10.

■■■■ The standard of review that this appellate court will undertake to decide whether a witness is competent for Rule 602 purposes is an abuse of discretion standard. *Cumis Insurance Society, Inc.,* 681 F.2d at 932. We will not disturb the trial

---

**4.** We comment that Ranieri has not clearly made his legal arguments because he emphasizes that the identifications made against him are "unreliable." There is no legal objection in regard to identifications based on "unreliability" per se. Under the due process clause, if an identification procedure is suggestive and, in the totality of the circumstances, unreliable, then the identification must be suppressed. *See Manson v. Brathwaite,* 432 U.S. 98, 97 S.Ct. 2243, 53 L.Ed.2d 140 (1977); *State v. Ivy,* 558 A.2d 209, 211 (R.I.1989). However, defendant explicitly states in his appellate brief that he is not claiming the identification procedures were suggestive.

Upon closer examination of what defendant is calling "reliability," we see that defendant is really claiming that the identification witnesses never saw the assailant because of the conditions surrounding the attack. Such a legal argument is properly called a Rhode Island Rules of Evidence Rule 602 objection for lack of personal knowledge. It unduly confuses the matter to

couch a Rule 602 argument in terms of "reliability."

We note further that defendant's fifty-page brief makes numerous references to events and facts occurring in this case. However, quite often defendant's brief fails to give any citation to where in the record or to where in the 1,321-page transcript we may find support for his propositions. We remind future parties appearing before this court that our understanding of their arguments will be greatly enhanced by their fully and carefully giving citations to the record, transcript, or other sources rather than leaving a proposition uncited.

**5.** Also, it should be noted that the justice's role in deciding a witness' Rule 602 competency is analogous to the justice's role in making an evidence Rule 104(b) ruling. *See* Advisory Committee Note to Rule 602 of the Rhode Island Rules of Evidence (" '[i]t will be observed that the rule [Rule 602] is in fact a specialized application of the provisions of Rule 104(b) on conditional relevancy' ").

court's Rule 602 ruling unless the court has clearly abused its broad discretion. *Hallquist*, 843 F.2d at 24; *United States v. Champion*, 813 F.2d 1154, 1172 (11th Cir. 1987).

■ On the facts of the instant case, the trial justice never made an explicit Rule 602 ruling since the parties did not frame the issue as a Rule 602 competency question. Nevertheless, we will undertake our review as if the trial justice had ruled that Elsie had personal knowledge of her assailant's identity and was thus competent under Rule 602 to so testify.

Two incidents in particular lead us to believe that Elsie is not competent under Rule 602. Elsie's uncontroverted testimony is that she believed for some time that defendant was always spying on her through the shade of her neighbor's house. She claimed that defendant had cut a hole in her neighbor's window shade in order to view her and that defendant would seal the hole back up when he was done. Assuming that there was such a hole and that there was such a person viewing her, Elsie readily admits she never saw that it was defendant who was looking at her. Yet, without any basis, Elsie still adamantly maintains that "she knew" it was Ranieri who was spying on her. She claims Ranieri watched her and always knew when she was in or out of the house.

Second, Elsie claims that prior to the present crime, defendant broke into her apartment on five different occasions. Again, Elsie has absolutely no evidence to substantiate her allegations. She readily admits she never saw Ranieri or anyone else actually enter her home. Elsie confronted defendant with her breaking and entering allegations sometime before the instant attack. It is at this prior confrontation in her back yard that he purportedly told her, "I'll get even with you."

The night of the attack, Elsie was grabbed from behind moments after she awoke at 4 a.m. Her uncontradicted testimony is that she never saw her assailant come up behind her, yet she knew it was Ranieri because he was always "watching her." Quickly the assailant threw Elsie to the floor and proceeded to strike her senselessly with a metal rod. Picard testified that after the assailant escaped, Elsie was crying, "Who was doing this to me?" Elsie never made any identification to anyone, despite repeated police urgings to give details of her attacker. She maintained for over eighteen months that she saw nothing. Even at trial she testified that she did not remember seeing Picard in her apartment the night of the attack.

Then on the eve of the trial, Elsie claimed she could make an identification. Elsie explained that she did not give a description of her assailant earlier because she was afraid of retribution from defendant or from defendant's friends in the neighborhood. She also claims that she had the opportunity to see her attacker despite the fact that she was grabbed from behind in her dark apartment.

We think it unmistakably clear that Elsie has a history of making unwarranted and unfair accusations against defendant. Elsie had absolutely no factual basis to make two prior serious allegations against defendant and we see nothing to indicate a factual basis for this third, most serious, allegation. We think Elsie's eighteen-month delay is not sufficiently explained merely by saying she was afraid. During all this time, defendant was incarcerated because of another charge or because he was unable to meet the bail set on this case. Despite this eighteen months of confinement, Elsie was never threatened by anyone. Elsie knew that defendant was in custody all during this period and that presumably he would be there for a significant period if he was convicted at a trial that was going to go forward without her assistance. During this eighteen-month period the Journal had published defendant's picture several times. We are incredulous that all these facts can be outweighed by Elsie's suddenly coming forward to make an identification, saying she knew all along that defendant was her assailant and that she was afraid to come forward.

Therefore, we rule that it was clearly erroneous for the trial justice to find that sufficient evidence was introduced that El-

sie had personal knowledge of her assailant's identity. Accordingly Elsie was not competent under Rule 602 of the Rhode Island Rules of Evidence to testify as to her assailant's identity, and her out-of-court and in-court identifications should have been suppressed.

## PICARD IDENTIFICATION

The defendant argues that Picard should not have been allowed to testify in-court that defendant had the same upper lip as the assailant, since Picard did not have personal knowledge of the assailant's identity.[6]

It is undisputed that the most that Picard could identify was the assailant's upper lip, the area from beneath the nose to the top of the assailant's lip. Picard never claimed to be able to identify the assailant's whole face. Again, the poor lighting contributed to this poor identification. Picard said on several occasions that he saw the upper lip for one to two seconds; another time he said anywhere from ten to sixty seconds. The trial justice ruled that Picard had an insufficient opportunity to view the assailant and thus he did not allow Picard to make an identification of Ranieri. Yet the trial justice did believe that Picard had an opportunity to view the assailant's upper lip and so he allowed Picard to testify that defendant's upper lip was the "same" as the assailant's.

The defendant argues that Picard made his original out-of-court full-face photo-array identification about two weeks after defendant's picture appeared in the Journal (which would make it about three weeks after the date of the crime). Picard admits he cut out and saved defendant's picture from the Journal before he saw the photo array. The defendant argues, therefore, that Picard's testimony is unreliable since Picard is testifying about what he saw in the Journal, not what he saw at the crime scene. The defendant also claims that the dark conditions, Picard's admittedly short viewing time, and the fact that Picard only saw the lip portion of the assailant's face all warrant a finding that Picard never had the opportunity to view the assailant.

Given the fact that Picard could only identify the upper-lip area of the assailant and that other men in the photo array admittedly had similar upper lips, we do not see how Picard could possibly make his identifications uninfluenced by the Journal picture.

■■■ We are mindful that at Picard's original photo-array identification at the police station, he was *not* asked to pick out the assailant's upper lip but, rather, he was asked to pick out the assailant's face. He was not shown pictures of just upper lips. He was shown complete faces. To make matters worse, Picard testified that all the faces in the array had similar upper lips. Given that an upper lip in and of itself is rarely a characteristic by which one can uniquely identify one individual from another, we do not see how Picard could identify the assailant's face just from knowing his upper lip. The best that Picard could have and should have been allowed to testify to is that defendant has an upper lip similar to the assailant's, not that the defendant's upper lip *is* the assailant's upper lip. In the instant case, Picard testified that Ranieri's upper lip was the "same" as the assailant's upper lip. To the jury, saying that Ranieri's and the assailant's upper lips are the "same" is tantamount to saying that Ranieri's and the assailant's *faces* are the "same." But we emphasize that even if Picard was restricted to testifying that Ranieri's upper lip was "similar" to the assailant's, such testimony would be unduly prejudicial because there is nothing particularly distinctive about the assailant's upper lip in this case. The weakness of using a nondistinctive body part for identification purposes is demonstrated by this case in particular because Picard testified that he was only 70 percent sure of his original full-face identification since he only saw the upper lip.

---

**6.** Again defendant has not framed Picard's identification as objectionable under Rule 602 of the Rhode Island Rules of Evidence for lack of personal knowledge of the witness. However, we read his brief as directed to such an argument. *See* note 4, *supra.*

■ We find that Picard's upper-lip identification must have been tainted by the Journal photos because we believe any witness would be unable to identify any defendant when the sole element of personal knowledge is the viewing of a nondistinctive upper lip. Picard admitted that the other members of the the full-faced photo array had similiar nondistinctive upper lips. However, he admittedly had no personal knowledge of the overall facial characteristics of the assailant. Accordingly, his testimony should have been suppressed under Rule 602 of the Rhode Island Rules of Evidence for lack of personal knowledge.

## SECRETION OF EXCULPATORY EVIDENCE

■ Ranieri claims that the lost picture of Henry is exculpatory because originally Picard identified Henry as the assailant using that picture. Ranieri's argument is that Picard's original description of the assailant, given at the scene, was that the assailant was a tall man in his twenties, with a moustache. Picard is six feet and one inch tall. He testified that on the night of the crime he was standing on some rags, which would bring his height to over that figure. Picard testified that while standing on the rags, he looked down just slightly and could see the upper lip of the assailant. Ranieri claims this description fits the description of Henry but varies rather significantly from Ranieri, who is five-feet-six-inches tall, weighs 150 pounds, is eighteen years old, and has a "short peach fuzz" moustache.[7]

Picard's oral description and on-scene identification preceded the publication of Ranieri's photograph in the Journal. Hence Ranieri claims that Picard changed his description of the assailant after seeing Ranieri's picture in the Journal and after seeing him in person. The defendant says that if he had the original photograph of Henry, he could demonstrate to the jury the disparity in descriptions given by Pi-

card, which would undercut any identification given by Picard.

The prosecution originally gave a police photo of Henry to the defense, representing that that photo was the photo supplied to the police by Lisa. When Picard was shown this photo at a pretrial suppression hearing, he said he had never seen the person in the picture before. To defense counsel's consternation, the prosecution had supplied the wrong photo of Henry (not the photo supplied by Lisa). Apparently the two photos of Henry differed so widely that Picard could state that the photos were not of the same person. The prosecution then represented that the police had given Lisa back the picture and that Lisa was not able to be located. The defendant's counsel on his own searched for and located Lisa. He got Lisa to testify in court that the police had never returned the photo to her and that in fact she had unsuccessfully attempted in the past to retrieve it from the police.

The prosecution argued in rebuttal to defendant's motion to dismiss for failure to provide this evidence that there was no bad faith in failing to provide the photo. The trial court agreed and on that basis denied the motion to dismiss. While we are not completely satisfied that the prosecution made diligent efforts to provide defendant with accurate information, we decline to disturb the trial justice's finding that there was no bad faith.

The prosecution also argues before this court that whatever assistance the picture may have offered to the defense, its absence is ameliorated in that defendant's cross-examination of Picard admittedly succeeded in destroying the credibility of Picard's identifications of Ranieri. We disapprove of the prosecution arguing that its negligence is cured by the exceptional legal skills of defense counsel. Perhaps the next defendant will not have such able representation. Nevertheless, we agree with the

---

7. We do not express an opinion about the degree to which the description of Henry and of Ranieri differ. Apparently the only evidence of how Henry appeared at the time of the incident was provided by Lisa in her testimony at trial.

She said Henry was about six feet tall and was thinner than Ranieri. She testified that she saw the assailant outside her window and that the physical characteristics of the assailant more closely resembled Henry than Ranieri.

prosecution that the extraordinary sanction of dismissal is not warranted for any prosecutorial misconduct that may have occurred in this case. *See State v. Chiellini,* 557 A.2d 1195, 1199 (R.I.1989).

## WITNESS' STATEMENTS OF BODILY THREATS

On a Friday afternoon after court let out, defense counsel by chance saw one of the state's key witnesses in a restaurant next to the courthouse. Counsel saw the witness speaking to one of the investigating officers. Suspecting coaching or the offering of some type of reward, defense counsel asked this witness about the restaurant meeting when court convened on Monday.

The witness explained that his car had broken down behind the restaurant and that he had entered the restaurant to call AAA. He explained that it was a chance encounter when he met the detective in the restaurant. Defense counsel's questioning clearly and admittedly was leading to a suggestion that there was some impropriety in the witness' meeting with the detective. After defense counsel continued to pursue this line of questioning, the witness explained that the detective had approached him to ask if everything was all right, and the reason why was that the detective knew that the witness had been threatened in regard to testifying in this case. The witness' statement was in response to defense counsel's question, "And when did you first see the detective?" Defense counsel objected to the witness' answer as nonresponsive and asked that it be stricken. The justice allowed the answer to stand. In the prosecution's closing remarks, the prosecution said, "Remember, [the witness] had several threats made to him. Threats that were reported to the police to investigate. Tapes of phone conversations where he had been threatened in regard to this case." The trial justice sustained defendant's objection to this statement but the trial justice failed to rule on defendant's request for a cautionary instruction in regard to the prosecutor's statement.

The defendant argues that under *State v. Burke,* 529 A.2d 621, 631 (R.I.1987), evidence of threats by unidentified third parties is not admissible absent a showing that the threats were made by or with the complicity of a defendant. Ranieri claims that he was not related to any alleged threats against the witness and that therefore the witness' statements should have been suppressed and cautionary instructions should have been given.

■■■ Assuming we were to agree that the witness' answer was nonresponsive to defense counsel's question, we do not find the admission of the answer reversible error. We believe that aside from whatever proposition the *Burke* case stands for, the prosecution on redirect examination could have properly rehabilitated its witness by asking the witness to explain the circumstances surrounding the encounter with the investigating officer. When defense counsel directs a line of questioning to the conclusion that the witness is being coached or rewarded for his testimony, then it is only fair that the prosecution should be given the opportunity to rebut those allegations by explaining the circumstances surrounding an otherwise suspicious event.

■■■ With respect to the prosecution's closing statement, the trial justice properly ruled that the statement must be stricken. There was no evidence introduced at trial in regard to recorded threatening telephone conversations. We must agree with defendant further that the trial justice should have ruled on whether a cautionary instruction was warranted. A cautionary instruction should have been given with respect to the prosecution's closing statements that were stricken. Nevertheless, the witness' statement concerning threats, which was properly admitted to rehabilitate the witness, is closely related to the prosecution's improper statements. We do not believe, therefore, that the trial justice's failure to give a cautionary instruction allowed wholly prejudicial evidence to be " 'indelibly etched' " in the jurors' minds. *See State v. DeCiantis,* 501 A.2d 365, 367 (R.I.1985). We will not dis-

turb the justice's cautionary instruction ruling (or, rather, the lack of a ruling) because the justice's failure to " 'disabuse the jurors' minds of the prejudicial effect' " of the prosecution's statements had a negligible effect on Ranieri's defense. Id. at 368.

## INCONSISTENT CONVICTIONS

■ The defendant argues that since he was acquitted of assault with intent to murder and found guilty of assault with a dangerous weapon, then the jury did not find an intent to murder. The defendant argues that intent to murder is a necessary element in this case to proving burglary. Therefore, defendant concludes that he cannot be convicted of burglary and acquitted of assault with intent to murder.

To be convicted under G.L.1956 (1981 Reenactment) § 11–8–1 of burglary, the state must prove a defendant " '[broke] and [entered] the dwelling house of another in the nighttime with the intent to commit a felony therein, whether the felony be actually committed or not.' " *State v. O'Rourke,* 121 R.I. 434, 436, 399 A.2d 1237, 1238 (1979). Here defendant made an oral bill of particulars asking which felony the state would be relying upon for a burglary conviction. The state responded with larceny over $500, robbery, or murder. The trial justice ruled that the state had not proven an intent to commit larceny over $500 or an intent to commit robbery. Therefore, the court said the requisite felony for a burglary conviction would be the crime of murder. In charging the jury, the trial justice explained the elements of burglary, count 1 in the indictment, and said that the jury must find that Ranieri intended to murder Elsie when he entered her apartment. In charging the jury on count 2, assault with intent to murder Elsie, the judge said that if this jury found that Ranieri had assaulted Elsie but that he did not do so with an intent to murder her, then it could find Ranieri guilty of the lesser included offense of assault with a dangerous weapon (which is also a felony under G.L. 1956 (1981 Reenactment) § 11–5–2, as amended by P.L.1981, ch. 76, § 1).

The defendant essentially argues that since the jury found him guilty of a lesser included felony (assault with a dangerous weapon) than the felony named in the burglary charge (murder), he cannot be convicted of burglary. We reject such a contention. We find nothing inconsistent with finding defendant guilty of both assault with a dangerous weapon and burglary and acquitting defendant of assault with intent to commit murder. The jury found an entry with the intent to commit a felony, assault with a dangerous weapon, and that is sufficient to convict for burglary in this case.

For the foregoing reasons we rule that the out-of-court and in-court identifications by Elsie and Picard were improperly admitted at trial. The admission of these identifications rises to prejudicial error requiring a new trial. In regard to the defendant's other claims of error, we affirm the trial justice.

The defendant's appeal is sustained in part and denied and dismissed in part. The judgment of the Superior Court is reversed in part and affirmed in part. The case is remanded with instructions for a new trial on all of defendant's convictions.