STATE

v.

Michael MENDOZA.

No. 95–38–C.A.

Supreme Court of Rhode Island.

April 3, 1998.

Jane M. McSoley, Aaron L. Weisman, Providence, for Plaintiff.

Paula Rosin, Paula Lynch Hardiman, Providence, for Defendant.

Before WEISBERGER, C.J., and LEDERBERG, BOURCIER, FLANDERS and GOLDBERG, JJ.

## OPINION

BOURCIER, Justice.

Following his conviction by a Superior Court trial jury for the second-degree murder of a fifteen-year-old boy, the defendant comes before us on appeal and asserts that we should set aside his conviction and order a new trial. We reject his appeal and affirm his conviction.

### Case Facts and Travel

Erickson Diaz, (Diaz) a fifteen-year-old boy, died on a sidewalk on America Street in Providence at about 2:30 a.m. on December 15, 1991. He had been in the wrong place at the wrong time, and happenstance had been unforgiving. His cause of death was a gunshot wound caused by a .357 Magnum bullet that had been fired from the front porch of a nearby tenement house at 97–99 America Street. That tenement house also served as an after-hours drinking club, or "sip joint." Michael Mendoza (defendant) operated that illegal after-hours club along with his wife, who served at times as the club's doorkeeper. The defendant was identified as the person who fired the .357 caliber bullet from the front porch of the tenement building that housed his after-hours drinking club.

The events leading to young Diaz's unfortunate and untimely death began on Saturday night, December 14, 1991, when Diaz went to the Conquistador Bar on Broad Street in Providence to be with friends. While there he met one of his friends, Rufino Ramos (Ramos), age nineteen, and another person, Luiz Nunez (Nunez), aged twenty-six, that he knew casually. The three remained at the Conquistador Bar until its legal closing time. They then decided to go to the after-hours drinking house or club operated by the defendant.

Nunez, because he had the use of a friend's car, drove Ramos and Diaz to the club located at 97–99 America Street in Providence, and when they arrived at the club, Nunez let Diaz and Ramos off at the club's front entrance and then drove a short distance down America Street to park the car. While he was parking the car, Ramos and Diaz entered the club, having been admitted by the defendant's wife. Unfortunately, as they entered, a fight involving two club patrons had just been abated, and the apparent loser of the late night unscheduled and untelevised fight turned out to be a friend of Ramos's named Alexis Abreu (Abreu). Abreu had sustained an eye injury and was visibly upset. He was leaving the club by a front door that opened onto a small porch with steps leading down to the sidewalk on America Street. Ramos, for some unexplained rea-

son, perhaps to render assistance to his friend, decided to follow Abreu out of the club, and young Diaz then followed both out. Once onto the porch Abreu suddenly stopped, turned back toward the club, took out a gun, and fired at least four shots into the club. Two bullets went through the front door, and two others shattered the club's front window. Within seconds, a man later identified as the defendant emerged from the club's front-entrance door with a gun in hand. Abreu, observing the defendant, fled down America Street followed by Ramos and young Diaz, both apparently sensing that gunshots would soon follow as they were running across America Street and away from the club. The defendant, standing on the porch, then began firing in the direction of the fleeing Abreu and necessarily also in the same direction that Ramos and young Diaz were running. Just as the defendant opened fire, Nunez, who by now had parked the automobile and was returning to the club, was standing at the foot of the steps leading up to the front porch of the club. Quite understandably, Nunez finding himself in a literal no-man's land, observing to one side of him Abreu, Ramos and Diaz running away and on the other side the defendant firing shots in their direction fell in panic to his knees and hastily crawled up the steps and scrambled into the club, seeking safe shelter. Once inside the club Nunez quickly observed the club patrons scattering, ducking for cover, and running out of the club, and he decided to call it a night. He exited through a rear door at a rate of speed that certainly eclipsed that with which he had entered through the front door. When the wild shooting stopped, it was then discovered that young Diaz had been hit and his lifeless body lay on the sidewalk a short distance from the club. He died there, the result of the .357 Magnum bullet wound in his back. Abreu and Ramos had somehow fortunately managed to avoid the fusillade fired by the defendant and had left the scene. When the police were later investigating the scene of the incident, Ramos returned and spoke with one of the investigating officers. He was then taken to police headquarters where he later gave and signed a statement recounting his recollection of what had taken place. Nunez, after learning of the death of his friend, young Diaz, went to the police headquarters building in Providence and there identified himself as an eyewitness to the shooting. He was shown a series of photographs of possible suspects, and he immediately identified the defendant as the person who had fired the shot from the front porch of the after-hours drinking club.

Sometime later, after an autopsy was performed on Diaz, the Providence police were able to obtain the bullet that had killed him. It was found to be a .357 caliber bullet. Another .357 caliber bullet was discovered and taken from a classroom wall in a school building just across the street from the after-hours drinking club. The police in addition seized eight live .357 caliber cartridges from a pantry drawer in the after-hours drinking club run by the defendant and his wife. The police also found two spent .32 caliber bullets inside the club, those bullets apparently having been fired from the gun used by Abreu when he was shooting into the club, which action had served to provoke the retaliatory barrage fired by the defendant.

The defendant and Abreu were both later charged jointly in a one count grand jury indictment for the murder of young Diaz. Defense counsel for Abreu moved to sever Abreu's trial from that of the defendant, and the trial justice, without objection from the defendant, granted Abreu's trial-severance motion. The defendant was tried first and convicted of second-degree murder. His appeal is before us. We address now his appellate alleged assertions of trial error.

## I

### Motion to Pass

The defendant's first claim of error is that the trial justice erred in denying his motion to pass the case because the prosecutor had mentioned in his opening statement that Diaz, Nunez, and their friend Ramos had gone to an "after hours bar" operated by the defendant on December 15, 1991, the night Diaz was shot.[1] The prosecutor had only

---

1. Defense counsel asserted in moving to pass the case:

once mentioned that the defendant's after-hours club was an illegal bar and that reference was only in the nature of a passing reference. The prosecutor never specifically referred to the defendant's operation of an after-hours club as a criminal act. We conclude, therefore, that the trial justice acted well within the bounds of his discretion in denying the defendant's motion.

Prior to selecting the trial jury, the defendant had filed a motion in limine, seeking to preclude any references to the defendant's operation of a "sip joint." The defendant had also sought to prevent any trial witnesses from using the phrase "sip joint." The defendant suggested that the prosecutor and the witnesses be limited to the use of the phrase "after hours" when referring to the defendant's after-hours drinking club. The trial justice refused the defendant's request, concluding that there was not "anything that's so prejudicial in that type of testimony." The trial justice did not believe that a reference to an after-hours club "automatically denotes in someone's mind that it's illegal." The trial justice offered, however, to give a cautionary instruction regarding the relevance of the defendant's operation of an after-hours bar, but defense counsel repeatedly declined such instructions at that time because "there's a possibility the jury will then automatically think, well, because he's giving us a cautionary instruction, it must be an illegal activity."

The prosecutor later, in his opening statement, did refer to the defendant's operation of an after-hours bar, and he also offhandedly referred in one instance to its being an "illegal bar." Defense counsel then moved to pass the case, which motion the trial justice also denied.

Later at trial, Rufino Ramos (Ramos), the friend who accompanied Diaz and Nunez to the defendant's establishment that fateful evening, testified that the defendant operated the after-hours club where the shooting took place. Defense counsel at that point requested that the trial justice give a cautionary instruction to the jury, notwithstanding defense counsel's earlier insistence, both at the hearing on his motion in limine and at the hearing on his motion to pass, that such an instruction not be given. The trial justice then, in accordance with defense counsel's request, did instruct the jury as follows:

> "You've heard some testimony that on the night in question the defendant was in some sort of after hours club or establishment. You must bear in mind that neither the nature of such a place nor the drinking activity that may have occurred in such a place has any bearing on the guilt or innocence of the defendant as to the charge of murder which is before you."

The defendant contends that that instruction was not sufficient to cure the undue prejudice caused by the prosecutor's references to the defendant's operation of an after-hours club. The defendant asserts that such references were inadmissible under Rule 404(b) of the Rhode Island Rules of Evidence, which sets forth the general rule that evidence of other crimes or bad acts by a defendant are inadmissible to show that the defendant acted in conformity therewith.

■ However, contrary to the defendant's assertions, Rule 404(b) is inapplicable here. The prosecutor's single passing reference to the after-hours club as constituting an illegal venture and his references to the defendant's operation of an after-hours club were necessary in order to explain to the jury how Diaz, Nunez, and Ramos, after leaving the Conquistador Bar when it closed, then went to 97–99 America Street where they were able to continue their Saturday night drinking activities. Those facts were necessary not only to show why Diaz went to 97–99 America Street but also to show why the defendant would be there and would have a purpose in protecting his club's patrons from someone shooting into the club. It would also show that the defendant would have

---

"MR. WALKER: Your Honor, I'm aware of the Court's ruling in regards to my motion in limine in regards to any information in regards to my client running an after hours club commonly known as a sip joint. At this particular point, the defense would make a motion to pass in regards to the prosecution, his opening statement brought out information that my client was running an after hours club, which is a crime, which he has not been charged with; and, therefore, it's prejudicial in regards to my client."

knowledge of and access to the .357 caliber bullets kept in a pantry drawer in the club. Although it is true that in presenting the complete background facts that existed at the time that Diaz was shot and killed, some of those background facts presented by the prosecutor may have indicated uncharged criminal conduct on the part of the defendant in operating his after-hours drinking club, evidence of that prior or contemporaneous uncharged conduct was not improper under Rule 404(b). *United States v. Currier*, 821 F.2d 52 (1st Cir.1987); *see also* Edward J. Imwinkelried, *Uncharged Misconduct Evidence* § 6:28 (1984). Accordingly, since some reference to the after-hours club was necessary and because the trial justice gave an appropriate cautionary instruction, we conclude that he did not err in refusing to grant the defendant's motion to pass the case, and the defendant was not prejudiced as a result of the trial justice's ruling.

## II

### Nunez's Identification Testimony

The defendant's next claim of error is that the trial justice should not have permitted Nunez to testify that he had observed the defendant shooting in the direction of Diaz. The defendant asserts that Nunez did not have sufficient opportunity to view the gunman and that consequently his identification of the defendant as the gunman was incompetent. The defendant also posits in support of that contention that there was not enough light in the doorway of the 97–99 America Street building to illuminate the porch sufficiently from where the defendant allegedly shot Diaz. The defendant also asserts that because there was a high level of stress and excitement stemming from the exchange of gunfire when Nunez allegedly observed the gunman, his ability to identify the gunman was reduced. The defendant attempts to support that assertion by highlighting the fact that Nunez was only able to give a

minimal description of the gunman to the police and that he had only seen the defendant briefly in passing prior to the incident in question.[2]

■ In *State v. Gardiner*, 636 A.2d 710 (R.I.1994), where the victim was brutally attacked by four men at night in the woods, we rejected the argument that the eyewitness testimony of the victim in that case was incompetent because the victim did not have sufficient opportunity to view her assailants because there was diminished lighting and a high level of stress stemming from the presence of weapons. Here there was nothing in the record indicating that the light on the porch was so poor that Nunez could not see the others around him. Certainly, there was more light on the porch than in the woods in *Gardiner*.[3] In fact, the evidence suggests that Nunez could see the porch clearly because he was able to approach the porch and see the stairs without any difficulty. Furthermore, as in *Gardiner*, although the level of situation stress was certainly higher, we do not feel that it detracted from Nunez's ability to identify a person he had previously seen on at least one occasion. *See State v. Charette*, 688 A.2d 1286, 1288 (R.I.1997)(upholding admissibility of eyewitness' nighttime identification of the defendant fleeing from the victim's front doorway based upon a brief observation where witness had known defendant previously); *see also State v. Mastracchio*, 546 A.2d 165 (R.I.1988)(instruction to jury permitting consideration of whether identification witness had ever seen the defendant before the confrontation was proper). The situation in this case is unlike the one in *State v. Ranieri*, 586 A.2d 1094, 1097 (R.I.1991), wherein we held that the victim there did not have sufficient opportunity to view her assailant and as a result could not testify in regard to his identity because she had no previous personal knowledge of him, as required by Rule 602 of the Rhode Island Rules of Evidence. The victim in that case was attacked from behind while

---

**2.** The description of the perpetrator that Nunez gave to the police indicated that the perpetrator had very dark skin "like a black guy," but the defendant does not, in fact, have such dark skin.

**3.** Even though the victim in *State v. Gardiner*, 636 A.2d 710, 717 (R.I.1994), said that the field leading to the woods was lit by the lights behind the apartment building bordering the field, she indicated that in the woods the lighting was at best "poor, but if in close range, visible."

in her dark apartment moments after having been awakened by the sounds of an intruder, and she was immediately beaten with a metal rod, which circumstances would obviously have affected her ability to recall the identity of her attacker. Additionally, in *Ranieri* we found that the victim had in the past made several unwarranted and unfair accusations against Ranieri, whom she later identified as her attacker. It was for all those reasons that we concluded in *Ranieri* that the victim's identification testimony was not competent. The facts and evidence in that case are completely distinguishable from the facts in the case now before us.

■ In this case setting Nunez was facing the gunman from a distance of some five feet or so as he approached 97–99 America Street and came even closer to him as he scrambled into the apartment through the doorway behind the gunman. The gunman was standing on the porch, brightened by the light emanating from the front door of the apartment. Nunez, in addition, had seen the defendant on at least one prior occasion, and testified that he recognized the gunman on the porch as that person that he had seen previously. Although it is possible that a jury might have found that Nunez was unable to view the defendant adequately, it was in the final analysis a fact finding to be made by the jury and the trial justice certainly did not err in refusing to take that credibility determination away from the jury. As we said in *Ranieri*, "In a situation in which the question of a witness's Rule 602 competency is close (that is, the jury could find that the witness perceived the matter testified to), the judge should admit the testimony since the matter then becomes one of credibility and is properly for the jury." 586 A.2d at 1098.[4] Accordingly, the trial justice did not err in

admitting the identification testimony of Nunez.

## III

### Cross–Examination of Officer Salerno

■ The defendant next claims that the trial justice erred in limiting his cross-examination of Officer Louis Salerno (Salerno) regarding a yellow vehicle bearing a Massachusetts license plate that was at the scene of an earlier incident to which the police had been called on Alverson Avenue in Providence, some several miles from the after-hours club. That same car was reportedly seen later in the area where Diaz was shot. Defense counsel sought to cross-examine Salerno on the police department's investigation of that vehicle. Defense counsel argued that despite his admission that such testimony would otherwise be impermissible hearsay, he was not seeking the introduction of such information in order to prove the truth of the matters asserted therein but only to show that "it was stated to the officer in his investigation." The trial justice found that it was an unrelated incident and not relevant to any of the issues in the trial and as a result he precluded that line of questioning. The admission or non-admission of testimony objected to as being immaterial or irrelevant is within the sound discretion of the trial judge. *State v. Verdone*, 114 R.I. 613, 617, 337 A.2d 804, 808 (1975). We conclude that the trial justice did not abuse his discretion and did not err.

The defendant it appears was apparently trying to prove, through Salerno's testimony, that another person could have possibly committed the murder of Diaz. However, nothing in defense counsel's offer of proof disclosed any possible connection between the shooting of Erickson Diaz and the presence of the yellow car. Although that car was allegedly

---

4. In *Manson v. Brathwaite*, 432 U.S. 98, 97 S.Ct. 2243, 53 L.Ed.2d 140 (1977), the United States Supreme Court quoted with approval Judge Leventhal's concurring opinion in *Clemons v. United States*, 408 F.2d 1230 (D.C.Cir.1968), that pointedly noted that identification testimony, even though significant evidence, is still *only* evidence for the trial jury to weigh and evaluate and "[c]ounsel can both cross-examine the identification witnesses and argue in summation as to factors causing doubt as to the accuracy of the identification—including reference to both any

suggestibility in the identification procedure and any countervailing testimony such as alibi." 432 U.S. at 114 n. 14, 97 S.Ct. at 2253 n. 14, 53 L.Ed.2d at 153 n. 14 (quoting *Clemons v. United States*, 408 F.2d 1230, 1251 (D.C.Cir.1968) (concurring opinion)). Later, in *Watkins v. Sowders*, 449 U.S. 341, 347, 101 S.Ct. 654, 658, 66 L.Ed.2d 549, 555 (1981), the Supreme Court reiterated that the reliability of identification evidence under the instructions of the trial judge is a "task our judicial system must assume juries can perform."

seen near the scene of the shooting and coincidentally also at the scene of an earlier disturbance some several miles distant in the same city, there was nothing presented to the trial justice indicating that there was anything to connect the yellow car to the shooting of Diaz. Furthermore, since that testimony was conceded to be hearsay and was only sought to be admitted to show the intensity of the police investigation concerning Diaz's death, the testimony could not be used to show that anyone in the yellow car was actually responsible for Diaz's death. If the intensity of the police investigation was what defense counsel was really seeking to demonstrate to the jury, there were certainly other means available to him to accomplish that goal. In fact, defense counsel was permitted to question Salerno regarding his follow-up investigation of the yellow car's license plate, but not permitted to question the officer about what the officer had been *told* by unknown persons concerning the yellow car's relationship with the earlier incident. Defense counsel then made an offer of proof in which there was no relevant indication of any evidence that connected the earlier incident on Alverson Avenue, several miles distant, to the shooting death of Diaz. Accordingly, we conclude that there was no error in the trial justice's ruling.

## IV

### New Trial Motion

■ The defendant's last claim of error is that the trial justice erred in denying his motion for new trial because the prosecution had failed to prove beyond a reasonable doubt that the defendant had killed Erickson Diaz. The defendant emphasizes in support of his motion Nunez's weak identification testimony, as discussed above, the prosecution's failure to prove a motive for the murder, and the testimony of two defense witnesses, Crystal Lovegrove (Lovegrove) and Marion Marrow (Marrow) who both testified that the defendant was inside the apartment when the shooting took place. The defendant further asserts that the bullets found in a drawer in the pantry area of the apartment, the same type as the one that killed Diaz, were mass produced and distributed throughout the country and thus were in no way identifiable as belonging to the defendant.

On a motion for new trial,

"the trial justice must consider all material evidence in light of the charge to the jury. Using independent judgment, the trial justice must pass upon the weight and credibility of the evidence and accept or reject conflicting testimony. At that point all proper and appropriate inferences may be drawn from the evidence adduced at trial. The trial justice must then determine whether the evidence presented a controversy upon which reasonable minds could differ or whether the evidence failed to prove guilt beyond a reasonable doubt. A new trial may be subsequently granted if the trial justice has reached a different conclusion from that of the jury and if it is specifically found that the verdict is against the fair preponderance of the evidence and fails to do substantial justice. The new-trial motion must be denied, however, if the trial justice finds that the evidence is balanced or reasonable minds could differ." (Citations omitted.) *State v. Marrapese*, 583 A.2d 537, 544 (R.I.1990) (quoting *State v. Dame*, 560 A.2d 330, 333 (R.I.1989)).

We conclude that the trial justice properly applied the above standard when denying the defendant's motion. As he explained, "When the Court considers a motion for a new trial, as you know, I sit in the capacity effectively as the 13th juror, so to speak, at which time I am expected to assess credibility and weigh the evidence." He did both adequately and accordingly, we affirm his decision.

■ The evidence before the trial justice certainly supported the jury's guilty verdict. As discussed earlier, Nunez had sufficient opportunity to view the defendant and was thus able to testify about the events occurring on the night in question. Although defense counsel was able to attack Nunez's testimony at several points, those perceived "weaknesses," as characterized by the defendant, went merely to the witness's credibility and were facts for the jury to consider when assessing credibility in reaching its verdict. As the trial justice noted in his decision on

the motion for new trial: "[W]hether or not * * * [Nunez's] testimony on identifying the shooter was impeached or not impeached is really an issue of credibility. Issues of credibility are essentially issues for the jury." The trial justice clearly recognized that reasonable minds on the jury could differ in regard to whether Nunez was testifying accurately, and, accordingly, the new trial motion was properly denied. We conclude no error on the part of the trial justice.

■ The defendant next asserts that he is entitled to a new trial because the prosecution failed to introduce evidence of any motive on the part of the defendant to murder Diaz. This contention is simply without merit. The prosecution was not required to prove motive in order to support a guilty verdict on the charge made against the defendant. *State v. Caruolo*, 524 A.2d 575, 584 (R.I.1987)("[c]onviction of crime never requires proof of motive, and the absence of motive, by itself, does not raise a reasonable doubt of guilt"). Furthermore, the jury could properly infer that the proprietor of an establishment like the one run by the defendant would certainly want to protect his establishment and his club patrons from incoming bullets. That foreseeable need to protect one's business establishment from harm could also be inferred from the presence of the .357 Magnum bullets that were found in the pantry drawer of the after-hours club.

Additionally, we, like the trial justice, find no merit in defendant's contention that the bullets found in the drawer in the pantry of the after-hours club were mass produced and not specifically identifiable as belonging to the defendant. A strong inference could certainly be drawn that the bullets found in the drawer of the pantry of the defendant's apartment belonged to the defendant and were used in a gun owned or possessed by the defendant. As the trial justice explained in his decision on the motion for new trial:

"The live cartridges, those 57's, were found in a drawer in the pantry area where the defendant's own witnesses placed him when the shooting from the outside into the house began. * * * It is reasonable for a fact finder to infer that where there are 57 magnum cartridges, there is also a 57 handgun. Indeed, that is precisely the type of weapon killed [*sic*] on young Erickson Diaz. And who else was in the position to know where the shells were, and the firearm, for that matter? The defendant. And what better place to keep ammunition and a firearm but in the very area in the club where liquor was served, where people bought drinks, or money was kept."

That determination by the trial justice was without error.

As for the two witnesses offered by the defense, Lovegrove and Marrow, we are unpersuaded that their testimony warrants a reversal of the jury's verdict. The trial justice made reference to the testimony of Marrow in his opinion on the new trial motion. He pointed out that she testified that when the shots were being fired, she "went down" and tried to protect herself from the flying bullets and that she "didn't look" at what the defendant was doing at that time because she was too busy protecting herself. She specifically admitted in her testimony that she "didn't see what he [the defendant] did" when the shots were fired. Thus, the trial justice properly disregarded her testimony.

With respect to the testimony of Lovegrove, a frequent customer at the defendant's after-hours club, who on the day of her testimony was driven to the courthouse by the defendant's wife, there was nothing contained in her testimony that would warrant the granting of the new trial motion. Her testimony was actually inconsistent in regard to whether she was continually watching the defendant during the melee. While at one point Lovegrove testified that she had her "eye on Michael [the defendant] for that entire time," she also testified at an earlier point in her testimony that she was not "watching Michael [the defendant] the whole time."[5] We note also that although the defendant characterizes Lovegrove as a disinterested witness, the testimony reveals that

---

5. As a matter of record, when the police arrived just minutes after Diaz's body was found, the after-hours club had been completely abandoned by its patrons, including Lovegrove and Marrow, who had scattered and disappeared into the night.

quite the opposite is true. She testified that she had been friends with the defendant and his wife for three years, that she had volunteered to testify for him, and that she had been driven to the courthouse by the defendant's wife.[6] It is fundamental that the credibility of the trial witness is a proper subject for the trial justice's independent evaluation on a motion for a new trial, and we are unable to conclude any error in the trial justice's credibility findings. Although the trial justice made no specific finding concerning Lovegrove's particular testimony, his ultimate ruling on the defendant's motion more than satisfies us that he found Lovegrove's testimony to be incredible. Accordingly, the defendant's new trial motion was properly denied.

## V

### Conclusion

For all the foregoing reasons, the defendant's appeal is denied and dismissed. The judgment of conviction appealed from is affirmed and the papers in this case are remanded to the Superior Court.

WEISBERGER, C.J., and LEDERBERG, J., dissent.

LEDERBERG, Justice, with whom WEISBERGER, Chief Justice, joins, dissenting.

I respectfully dissent from the majority's opinion because I believe that the state in this case failed to prove that Michael Mendoza is guilty of second-degree murder beyond a reasonable doubt. It is my opinion that the trial justice was clearly wrong in denying this defendant's motion for a new trial.

It is well settled that in deciding a motion for a new trial, the trial justice must determine "whether the evidence adduced at trial is sufficient for the jury to conclude guilt beyond a reasonable doubt." *State v. Scurry,* 636 A.2d 719, 725 (R.I.1994). A trial justice's ruling on a new trial motion is entitled to great weight, *State v. Dame,* 560 A.2d 330, 332 (R.I.1989) (citing *State v. Henshaw,* 557 A.2d 1204, 1207 (R.I.1989)), provided that the trial justice has "articulated an adequate rationale for denying a motion." *State v. Bleau,* 668 A.2d 642, 646 (R.I.1995). In so doing, the trial justice must pass upon the weight and the credibility of the evidence and accept or reject conflicting testimony, using his or her independent judgment. *See id.*

In this case the transcript from the hearing on the motion for a new trial reveals that the trial justice failed to assess independently the credibility of the witnesses. At that hearing, the trial justice correctly explained that "[w]hen the Court considers a motion for a new trial, as you know, I sit in the capacity effectively as the 13th juror, so to speak, at which time I am expected to assess credibility and weigh the evidence." If the trial justice had fulfilled his responsibility, he would have been compelled to conclude that the inconsistencies in Luis Nunez's testimony, coupled with the undisputed facts about the physical environment in which Nunez claimed that he witnessed defendant discharge a weapon, created a serious credibility problem such that Nunez's testimony—the only testimony that identified defendant as the shooter—could not carry the state past its burden of proof beyond a reasonable doubt.

In contrast to the majority's benign reference to "those perceived 'weaknesses'" in Nunez's testimony and identification of defendant, the record reveals that Nunez was an extremely problematic witness who contradicted himself on more than one occasion.[7]

---

**6.** Although defense counsel made clear that the reason the defendant's wife drove Lovegrove to the courthouse was that he was unexpectedly unable to do so himself, that partisan driving arrangement certainly indicated that Lovegrove was aligned with the defense.

**7.** The majority's two-sentence summation of Nunez's identification of defendant at police headquarters errs by oversimplifying the circumstances surrounding Nunez's identification. For example, Nunez did not travel to the police sta-

tion alone, but rather, he was accompanied by the family of the victim. Moreover, Nunez was aware that defendant had been arrested for the murder of Diaz when he went to the station.

At a pretrial hearing, the following colloquy occurred during direct examination of Nunez by the prosecutor in respect to Nunez's identification of defendant from a photo lineup:

"Q. Okay. What did they ask you to do with those six photos?

He was an admitted perjurer who had been convicted three times in New York for possessing illegal drugs with the intent to sell. He told the police his name was Juan Rodrigues when he first identified defendant from a photo lineup, and he again offered this false name when testifying at the pretrial hearing. Nunez was also in the United States illegally and was deported to his native Dominican Republic after having been convicted of yet another drug-related offense subsequent to defendant's arrest. He denied at trial what even the prosecutor admitted was true—that at Nunez's own request the Rhode Island Attorney General agreed to write a letter to the Immigration and Naturalization Service attesting to Nunez's cooperation with the Department should Nunez return to this country and testify against defendant. At the time of defendant's trial Nunez had been allowed back into the United States only because he promised to leave immediately after the trial, and he was under twenty-four-hour police supervision while in this country.

Nunez's testimony at the trial was seriously impeached by his prior testimony at a pretrial hearing and by his own statements to the police. For example, he first testified at trial that he was standing on the sidewalk when Alexis Abreu exited the apartment and began shooting; he then claimed that he was standing on the steps to the apartment at the time. When first recounting the shooting to the police, Nunez explained that "I dove down to the street and hid. After the shooting stopped, I got up and ran home." At the trial, in contrast, he claimed that as the second shooter came to the door and started firing toward Abreu, "I fell on my knees, and then I tried to go through [the second shooter's] leg[s] and started to crawl and went up and through the back door, [and I then] went out through the back door." Accepting Nunez's trial testimony would require believing that in his effort to escape the life-threatening hail of bullets, Nunez ran up the steps, onto the porch, and through the legs of the very individual at whom Abreu was, by Nunez's own account, firing his weapon. To assert that one's instinct for self-preservation would operate in such counterproductive fashion defies reason.

Furthermore, Nunez's testimony revealed that the physical conditions were exceedingly poor for making a positive identification of the second shooter. He conceded that there was no porch light, and no evidence was presented to suggest that there were street lights illuminating the porch, in the "two or three seconds" interval during which Nunez viewed the person shooting from the porch. Incredibly, in Nunez's first statement to police he described the shooter as five-foot-six or five-foot-seven inches tall and "dark skinned like a black guy." The defendant has a light complexion and his claim that he

"A. To point to the one I knew as Michael Mendoza.
"* * *
"Q. Did the police tell you which photo was the photo of Mendoza?
"A. First they showed to me, and then I told them which one it was."

On cross-examination, the following colloquy occurred:

"Q. Did the officer state to you to point to the person you knew as Michael Mendoza?
"A. Yes.
"Q. And was it at this point that you pointed out Michael Mendoza in the photo display?
"Yes."

Subsequent attempts to clarify the circumstances in which Nunez identified defendant from the photo display highlighted the equivocal nature of Nunez's recollection and testimony. For example, when Nunez was asked by the prosecutor if the officer used defendant's name before or after Nunez *selected defendant's photo from the array*, Nunez replied, "After I pointed it out." Yet, when defense counsel asked immediately thereaf-

ter, "Isn't it a fact that once [the officer] showed you the photo array the officer said—he mentioned Michael Mendoza's name *when he showed you the photo array?* ", Nunez replied, "I don't remember very well." (Emphasis added.) The import of Nunez's equivocal testimony is highlighted by the following interchange between Nunez and the trial justice:

"THE COURT: Do you have a clear memory that the man who was shooting was the man who is in this courtroom?
"THE WITNESS: Yes.
"THE COURT: *Did you need to look at the photographs to remember that?*
"THE WITNESS: *Yes.*" (Emphases added.)

In addition, at the pretrial hearing Nunez identified Providence Police Detective Michael Panzarella as the individual who showed him the photo display, but Panzarella testified that the photographs were shown to Nunez by another officer and that he (Panzarella) was not even in the room when the photographs were shown to Nunez.

is five-foot-eleven inches tall was never controverted. Moreover, at trial, Nunez, when shown a picture of the house where the shooting occurred, could not confirm that the house depicted was the same house at which he had been that night, but nonetheless he claimed to be certain that the individual who barely emerged from the house and started shooting from the dark porch was defendant. The trial justice himself remarked of Nunez that "the independent recollection of the witness is not as strong as I have seen in other cases."

In light of the undisputed characteristics of the environment in which Nunez—the sole identifying witness—claimed to have seen defendant fire the shot that allegedly caused Diaz's death and given the inconsistencies in Nunez's version of events, the trial justice's assessment of Nunez's credibility was of paramount significance in ruling on defendant's motion for a new trial. It is this fact that renders particularly troublesome the trial justice's assessment during the hearing on defendant's new trial motion that

> "Mr. Nunez did positively identify [defendant] as the shooter at the top of the stairs. As to whether or not his testimony on identifying the shooter was impeached or not impeached is really an issue of credibility. Issues of credibility are essentially issues for a jury."

The trial justice thus deferred to the jury this crucial issue and thereby abdicated his role as "the 13th juror." Hence, he failed "properly [to] appl[y]" the well-settled standard of review for evaluating new trial motions.

8. The majority's claim that Lovegrove "testified that she had been friends with the defendant and his wife for three years" is misleading. It was in the context of testimony that she had been a repeat customer at the after-hours club—at which entrance was controlled by either defendant or his wife—that the following colloquy occurred:

> "Q. Okay. How long have you *known* [defendant's wife]?
> "A. Maybe three years.
> "Q. Okay. And how long have you *known* [defendant]?
> "A. About the same amount of time.

Moreover, Nunez's assertion that defendant was the person shooting from the porch was directly contradicted by two witnesses for the defense. Both Crystal Lovegrove [8] and Marion Marrow, who were present at the after-hours club on the night in question, testified that defendant never left the kitchen area during the shooting. Lovegrove testified that she was in the kitchen area of the club, obtaining a drink from defendant, when the shooting broke out and a general panic ensued. Her testimony was unequivocal:

> "Q. And what did you hear as you were getting the drink from [defendant]?
> "A. Shooting.
> "* * *
> "Q. And *at any point,* did you see [defendant] go outside *when the shooting was happening?*
> "A. *No.*" (Emphases added.)

On cross-examination, when asked what she did when the shooting started, she answered:

> "I was waiting. It was like I was standing still, waiting for the shooting to stop, because I thought it was in the house[, it sounded so close.] So, I was scared. *Everyone was coming towards [defendant]* asking him what's going on. I was following the crew to get out." (Emphasis added.)

Lovegrove's cross-examination also included the following:

> "Q. You didn't have your eye on [defendant] for that entire time when panic set out, did you?
> "A. Yes, I did.
> "Q. You did?
> "(WITNESS NODDING)." [9]

> "Q. Okay. And you're friendly; they didn't have to subpoena you to come here today, did they?
> "No." (Emphases added.)

9. The majority's reference to an inconsistency in Lovegrove's testimony in this regard is also misleading. A review of the transcript reveals that Lovegrove did respond in the negative when asked by defense counsel if she had been "watching [defendant] the whole time." However, this question was disconnected from any questioning about the actual shooting incident, and it appears that Lovegrove likely construed defense counsel to be asking her if she had been watching defendant during the entire time she was in

Lovegrove was insistent that defendant did not go out the door at any time during or prior to the shooting.

Marrow also testified that defendant was still in the kitchen area when the shooting started and that he did not leave the area until after the shooting stopped. She explained that she was quite confident in her recollection because she had gotten a drink from defendant shortly before the shooting broke out and had been paying close attention to him because she found him attractive.

The presence of .357 Magnum cartridges in a drawer in the pantry of the after-hours club certainly constitutes circumstantial evidence but not proof of defendant's guilt beyond a reasonable doubt. The state's own witness, FBI Special Agent John Lewoczko, testified that there are literally millions of these bullets, made by the same manufacturer as those found in the drawer, in the United States today. The trial justice based his denial of the motion for a new trial on his opinion that "the eyewitness identification of the defendant by Mr. Nunez, together with the strong circumstantial evidence of the shells, is more than ample to support the jury's verdict."

It is my opinion that the evidence in this case was not sufficient to support the jury's finding that defendant was guilty beyond a reasonable doubt. It is axiomatic that the requirement of proof beyond a reasonable doubt "is an ancient and honored aspect of our criminal justice system." *Victor v. Nebraska*, 511 U.S. 1, 5, 114 S.Ct. 1239, 1242, 127 L.Ed.2d 583, 590 (1994). At the time the United States Supreme Court expressly held that "the Due Process Clause protects the accused against conviction except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which he is charged," *In re Winship*, 397 U.S. 358, 364, 90 S.Ct. 1068, 1073, 25 L.Ed.2d 368, 375 (1970), it declared that

"the reasonable doubt standard is indispensable for it 'impresses on the trier of fact the necessity of reaching a *subjective state of certitude of the facts in issue.*' Dorsen & Rezneck, In re Gault and the Future of Juvenile Law, 1 Family Law Quarterly, No. 4, pp. 1, 26 (1967).

"Moreover * * * [i]t is critical that the moral force of the criminal law not be diluted by a standard of proof that leaves people in doubt whether innocent men are being condemned. It is also important in our free society that every individual going about his ordinary affairs have confidence that his government cannot adjudge him guilty of a criminal offense without convincing a proper factfinder of his guilt *with utmost certainty.*" *Id.* at 364, 90 S.Ct. at 1072–73, 25 L.Ed.2d at 375. (Emphases added.)

Nearly ten years after its pronouncement in *Winship*, the United States Supreme Court observed that the reasonable-doubt standard "impress[es] upon the factfinder the need to reach a *subjective state of near certitude* of guilt of the accused." *Jackson v. Virginia*, 443 U.S. 307, 315, 99 S.Ct. 2781, 2787, 61 L.Ed.2d 560, 571 (1979). (Emphasis added.) Moreover, the United States Supreme Court has emphasized that not only must a juror be convinced of a defendant's guilt beyond a reasonable doubt but the government also must *prove its case* by proof beyond a reasonable doubt. *Victor*, 511 U.S. at 5, 114 S.Ct. at 1240, 127 L.Ed.2d at 588. The frail evidence presented in this case does not constitute *proof that meets the requisite standard of proof beyond a reasonable doubt, nor has the government met its burden of proof.

A trial justice's ruling on a motion for a new trial must be overturned if the justice overlooked or misconceived material evidence or was otherwise clearly wrong. *Scurry*, 636 A.2d at 725. The transcript from the hearing on the motion for a new trial revealed that the trial justice clearly overlooked material evidence by not passing at all upon the testimony of defense witness Lovegrove, who was unequivocal in her assertion that the defen-

---

the after-hours club. This interpretation finds ample support in the record. Upon redirect examination following the allegedly inconsistent statement, the following was elicited:

"Q. Miss Lovegrove, *at the time the shooting was occurring,* was [defendant] in the kitchen *during the whole period of time?*
"A. He was in the pantry serving drinks." (Emphases added.)

dant had remained in the kitchen area during the entire time of the shooting. The trial justice failed to discuss his opinion of her testimony in ruling on the new trial motion and thereby erred by ignoring the directive of our past cases that "the record should reflect a few sentences of the justice's reasoning on each point." *State v. Banach,* 648 A.2d 1363, 1367 (R.I.1994) (citing *State v. Girouard,* 561 A.2d 882, 890 (R.I.1989)). The majority's assertion that the trial justice's "ultimate ruling on the defendant's motion [for a new trial] more than satisfies us that he found Lovegrove's testimony to be [incredible]" improperly draws a conclusion that has not been stated in the record. If the trial justice disbelieved and therefore disregarded Lovegrove's testimony, he was required to provide his rationale for doing so.

For all the foregoing reasons, I would sustain the defendant's appeal and remand the case for a new trial.