**STATE**

v.

**Derick HAZARD.**

**No. 99–127–C.A.**

Supreme Court of Rhode Island.

May 16, 2002.

Aaron L. Weisman, Assistant Attorney General, Annie Goldberg, Assistant Attorney, for plaintiff.

J. Richard Ratcliffe, Providence, for defendant.

Present: WILLIAMS, C.J.,
LEDERBERG, BOURCIER,
FLANDERS, and GOLDBERG, JJ.

## O P I N I O N

WILLIAMS, Chief Justice.

In this appeal, the defendant, Derick Hazard (Hazard), asks this Court to set aside his 1998 murder, conspiracy, and assault convictions and order a new trial so that he may reassert his alibi defense that he could not have committed the crimes because he was allegedly in Ohio at the time of the murder.

This case presents a unique opportunity for this Court to briefly compare the role of the trial and appellate tribunals to the very different evaluation that may be engaged in by the media. In a somewhat unusual turn of events, after Hazard's first trial, a Providence Journal (Journal) reporter conducted an investigation causing Providence city government to reopen the case to reexplore Hazard's alibi defense. The Journal reported that there was additional evidence that supported Hazard's alibi and quoted Hazard, who claimed that he should be given a new trial because he was not guilty. The articles themselves are not part of the record of the case, and thus, were not considered as evidence by this Court. However, the evidence "revealed" by the "independent" investigation largely was the subject of Hazard's second motion for a new trial, and thus, was properly evaluated by both the trial justice and this Court.

Specifically, the Journal reporter found New Jersey police records showing that the rental car that Hazard said he traveled in to Ohio was stopped by a New Jersey state trooper on the day of the murder. The Journal reporter contacted the state trooper who conducted the stop, but the trooper was unable to place Hazard in the vehicle. The Journal found that a written warning was issued to the driver of the vehicle. The reporter continued her investigation in Ohio. The Journal reported that thirteen people corroborated Hazard's alibi, although only three of them testified at the trial.

Each of these pieces of information was considered by the trial justice who evaluated Hazard's second motion for a new trial. The function of the hearing justice at that time was to make a first-hand determination about the allegedly newly discovered evidence, considering both the police records and live witness testimony. The trial

justice concluded that the jury verdict was correct according to the law.

Like the trial court, this Court is bound by the law, albeit by a different standard of review. It is not our task to engage in a wholesale review of the evidence and the witnesses, nor is it our duty to engage in an independent investigation or fact-finding role. Additionally, we cannot render an "objective" opinion of Hazard's guilt or innocence because we are not permitted to do so by law. Instead, we must carefully examine Hazard's instant appeal using only the applicable standard of appellate review. As a result, we sustain the trial justice's decisions because (1) eyewitness credibility is a determination to be made by the jury, (2) there was sufficient evidence to sustain the jury verdict, (3) Hazard failed to demonstrate that the New Jersey traffic stop evidence was newly discovered, (4) there was no constitutional infirmity in the cross-examination of the eyewitness, and (5) the trial justice's evidentiary error was harmless beyond a reasonable doubt.

## I

### Facts and Travel

Shortly before midnight on Thursday, July 18, 1996, David Andrews (Andrews) was shot and killed as he walked on West Clifford Street in Providence. That night, Andrews was with his cousin, Andre "Bucky" Williams (Williams). As they walked, Williams noticed a vehicle slowly approaching the pair from behind. The vehicle stopped where Andrews and Williams were walking and the pair stopped. Williams, who was standing on the side closest to the vehicle, heard one of the occupants say "[w]hat's up now, motherfucker?" Two of the four people in the vehicle began shooting at Andrews and Williams. In an attempt to avoid injury, Andrews and Williams immediately began

"spinning away" toward a thicket of high grass adjacent to the sidewalk. As the vehicle sped away, Andrews began to run, but soon collapsed from a gunshot wound. Williams, who had fallen to the ground, stood up, watched the vehicle leave the scene, and then ran to where his cousin collapsed.

Soon thereafter, Officer Glenn Cassidy (Officer Cassidy) of the Providence Police Department received a dispatch about the shooting. Officer Cassidy responded to the scene and was "flagged down" by Williams. A small crowd assembled around Andrews's body. Williams told Officer Cassidy that the vehicle involved in the shooting was maroon. Williams did not give any further details about the incident.

Approximately two hours later, Williams gave a formal statement to Detective Steve Springer (Det. Springer) of the Providence Police Department. In his statement, Williams told Det. Springer that he "tried to look into the car to see who was in it, but all [he] saw was fire ***." He told Det. Springer that he was not able to see the persons who fired the weapons, but he did see "the black face." He also stated that he believed there were four people in the car, and he formally described the color of the car as being cranberry with a gray bottom. Williams also mentioned that he thought the car was a Ford Taurus because he was able to see the word "Ford" on the right side of the trunk as it sped away.

The following Monday, Williams returned to the Providence Police station, to change his earlier statement. He told Detective Robert Muir (Det. Muir) that he could identify the occupants of the car, but that he was "afraid to tell [him] the night it happened." At that time he identified the occupants as defendants Hazard, Troy

Lassiter (Lassiter), and David Roberts (Roberts)[1] (collectively referred to as defendants). Williams also stated that "some other guy was driving [but that he didn't] know who he was." Williams further elaborated that Hazard had shot at the pair from the front passenger seat, that Lassiter did the same from the rear passenger seat, and that Roberts was seated in the rear driver's side seat. Finally, he mentioned that Lassiter's firearm had the "most fire coming out of it," and was louder than Hazard's firearm.

Detective Muir then showed Williams a vehicle and asked him if he recognized it. Williams identified the vehicle as the same one used in the shooting. Williams also told Det. Muir that he knew Hazard, Lassiter, and Roberts. In fact, he said that he had seen all defendants on the day of the murder at the YMCA "looking all mean and evil." Detective Muir then showed Williams four photographs. Although Williams identified Hazard, Lassiter, and Roberts from the photographs, he could not name the suspect in the fourth photograph, Lassiter's brother, James Lassiter. However, he did say he recognized James Lassiter because he was also at the YMCA on the day of the murder.

On February 4, 1997, the Providence County grand jury returned a four-count indictment against Hazard, Lassiter and Roberts. The defendants were charged with first-degree murder, conspiracy to commit first-degree murder, assault with the intent to commit murder, and conspiracy to assault with the intent to murder.

Just over a year later, in March 1998, Williams appeared at Hazard's attorney's office and executed an affidavit recanting his earlier identification of Hazard. He signed an affidavit stating that he had named Hazard because he was threatened to do so and that Hazard "positively and unequivocally was not present in the vehicle" the night of the murder.

Before trial, Hazard's counsel filed a motion to suppress Williams's identification testimony alleging that it was the product of an impermissibly suggestive showup,[2] unreliable, and would deprive Hazard of a fair trial. After a two-day hearing, the trial justice denied Hazard's motion. In doing so, the trial justice found that Williams's identification of Hazard was credible and reliable. In late June, the trial began. On the first day, Lassiter's counsel successfully moved to sever Lassiter's trial from that of Hazard. The state proceeded against Hazard and Roberts. The state called Williams as its first witness. During his testimony, Williams stated that he knew Roberts before the murder because Roberts previously had robbed Andrews. Both Hazard and Roberts asked the trial justice to pass the case because of the prejudicial nature of the statement. A mistrial was granted and the trial was rescheduled to begin on July 8, 1998.

At the second trial, besides Williams and Det. Muir, who testified to the facts as stated above, several other witnesses testified for the state. Carolyn Johnson (Johnson) testified that her vehicle was seized the day after the murder. Johnson further testified that her husband, Robert Jackson (Jackson), had been driving the car the previous evening around the time

---

1. Williams originally identified the man in the rear driver's side seat as David Lassiter instead of David Roberts. However, both names belong to the same person, legally named David Roberts but also known as David Lassiter.

2. Although Hazard alleged in his written motion that the showup was flawed, he did not pursue this argument at the hearing, nor was it raised on appeal.

of the murder. The state also called Kevin Malloy (Malloy), the District Supervisor for Narragansett Electric Company, to testify about the lighting in the area of the murder scene. He testified that according to electric company records, there was no evidence that the pole lights near the murder scene failed to work properly on the evening of the murder. Malloy described the lighting conditions as "highlighted" in the area where the murder took place.

The state next called Rene King (King), who testified that just before 11 p.m. on the night of the murder she talked to Andrews, her cousin, near the intersection of Providence Street and Prairie Avenue. She testified that Andrews was alone and that she did not see Williams (a cousin of hers) nearby. After speaking with Andrews, King began walking away. She testified that she saw Andrews head toward West Clifford Street and that there were two or three other people in the area, but that she could not see them without her eyeglasses. King then heard what she thought were "fireworks," and then saw a burgundy- or cranberry-colored car, with a chrome or silver bottom, pass by. Wraina Dale (Dale), Andrews's former girlfriend, testified that on the evening of the murder, she had paged Andrews several times just to say hello, but she did not meet up with him at any point.

Detective Robert Badessa (Det. Badessa) testified that he responded to the murder scene and discovered shell casings that were discharged from two separate firearms. Four casings matched a .45–caliber firearm and four others matched a .22–caliber firearm. The casings were seized but only partial or fragmented fingerprints were recovered from them. No firearms were found at the scene. Detective Badessa further testified that a .45–caliber weapon has a louder report than a .22–caliber firearm. Detective Badessa also testified about the location where the shell casings were found. Casings were found on both the east and west sides of the street, which measured twenty-four feet across. Shell casings also were found much further down the street from where Andrews collapsed. Lastly, Det. Badessa testified that the two wounds that Andrews suffered probably were caused by the .45–caliber firearm, because of the size of the wounds.

The state's chief medical examiner, Elizabeth Laposata, M.D. (Dr. Laposata), testified about Andrews's wounds and the autopsy she conducted. She testified that Andrews suffered two gunshot wounds, possibly from the same bullet. Andrews had suffered a fatal wound to the heart and another wound in his right hand. Doctor Laposata indicated that the firearm must have been further than a foot away from Andrews when fired because of the absence of soot or gunpowder on the skin. Doctor Laposata also indicated that it was possible for Andrews to have suffered the chest wound and to have continued running a distance before collapsing because it would take several moments before he lost enough blood to cause him to collapse. Doctor Laposata also testified that the size of Andrews's wounds were consistent with a .45–caliber bullet.

At the close of the state's case, Roberts's attorney moved for a judgment of acquittal, pursuant to Rule 29 of the Superior Court Rules of Criminal Procedure. Roberts's counsel argued that the state's evidence was legally insufficient to support a guilty verdict beyond a reasonable doubt on any of the four counts in the indictment. Specifically, he argued that the state failed to meet its burden because the prosecutor merely had established Roberts's presence at the murder scene. After careful consideration, the trial justice granted Roberts's motion, leaving only Hazard to present his defense.

Hazard's defense consisted mainly of his alibi. Several family members and friends testified that Hazard could not have committed the murder because he was in Ohio on the night it took place. Hazard presented no physical evidence, such as receipts from gas, food, or tolls, from the day of the murder, to corroborate the testimony of the witnesses. Hazard presented no evidence about being stopped by the New Jersey state trooper, a fact that later became the subject of a motion for a new trial.

The jury ultimately found Hazard guilty of all counts, except conspiracy to assault with the intent to commit murder. Hazard subsequently filed a motion for a new trial, alleging that the verdict was against the law and the weight of the evidence. The trial justice denied the motion and sentenced Hazard to life imprisonment at the Adult Correctional Institutions (ACI) for the first-degree murder conviction; ten years, suspended, for conspiracy to commit murder; and twenty years for assault with the intent to murder. All sentences were to run concurrently. A judgment of conviction was entered on September 30, 1998, and Hazard timely appealed. In November 1998, Hazard retained new counsel.

Hazard filed a second motion for a new trial based on newly discovered evidence on December 18, 1998. Because the papers in the case were in this Court pending the resolution of Hazard's initial appeal, Hazard's motion to remand the papers to the Superior Court was granted. This Court also granted Hazard's motion to hold the briefing schedule in abeyance pending the resolution of the motion for a new trial and refiling of the papers. In the Superior Court, the trial justice held a three-day evidentiary hearing beginning on September 13, 1999. The trial justice issued his written decision on December 3, 1999, denying Hazard's second motion for a new trial.

Hazard is now before this Court on appeal of his conviction and the denial of both motions for a new trial.

## II

### Motion to Suppress Identification Testimony

Before trial, Hazard moved to suppress Williams's testimony, alleging that it was "the product of an impermissibly suggestive showup, *** unreliable, and the introduction of said identifications would result in the denial of a fair trial ***." Hazard argued that the identification was unreliable because Williams failed to make an initial identification, and then recanted his subsequent identification. At the evidentiary hearing, Williams testified that when the vehicle approached him and Andrews, they had been walking in an area without many street lights but that he was able to see what was happening. He described the vehicle as a two-tone cranberry and gray Ford Taurus. Williams testified that the vehicle stopped about seven feet away from him. Williams was closer to the vehicle than Andrews, who walked on the sidewalk to his right. Williams testified that he was able to view and identify the occupants before they started shooting. Williams said that he recognized the people inside the car as Hazard, Lassiter and Roberts. Williams also testified that the entire incident happened very quickly, and that as soon as the shots rang out, he no longer was looking at the vehicle. Instead, Williams began "spinning" toward the ground.

Furthermore, Williams testified that he was able to make eye to eye contact with each defendant. He testified that he knew Lassiter because Lassiter fathered a child with Williams's cousin. He also testified

that he had known Hazard "a long time" and that he was also familiar with Roberts. On direct examination, Williams confirmed that he did not identify any of defendants when he gave his first statement to the police hours after the shooting because he did not "want nothing [sic] to do with it." Williams stated that upon the advice of his grandmother, he returned to the police station on July 22, 1996, and identified defendants.

The state's attorney then questioned Williams about the recantation. Williams testified that in March 1998 he signed an affidavit recanting his earlier identification of Hazard because Hazard had asked him to do so. Williams testified that Hazard did not threaten him or offer him any money in exchange for the affidavit. Hazard allegedly picked Williams up and drove him to his attorney's office. Williams testified that he executed the affidavit because he feared for his life and did not want any further problems.

Williams first testified that when he arrived at Hazard's attorney's office, the attorney asked him some questions and Williams gave the attorney the information memorialized in the affidavit. He testified that he looked the statement over, but did not read it before signing. The prosecutor then asked Williams to read the first paragraph of the affidavit to himself. Williams told the hearing justice that he had read it over and that his exact words were contained in the affidavit. However, he then stated that he could not define "recant." After reading the second paragraph, Williams stated that he had lied when he alleged that he was forced to identify Hazard. After reading the third paragraph, he similarly stated that it was false. When the prosecutor asked Williams whether he had been forced to make the affidavit, Williams responded that he had not been forced.

Defense counsel attempted to impeach Williams's credibility by pointing to inconsistencies in his testimony. First, Williams did not initially say that his grandmother was the impetus for his second statement. Instead he previously had testified that he returned to the police station because he was in a state of shock. Williams also testified that he was approximately seven feet from the vehicle the night of the shooting, yet he previously had testified that he was only three feet away. During cross-examination, Williams initially conceded that his entire first statement was not true. However, he then said that the only false part was that he was unable to identify the shooters. When asked about his second statement he testified that it was entirely true, except for the part where he changed his motivation to identify defendants.

Williams was then cross-examined about the photographs. He testified that after identifying each of the three photographs as matching the three defendants, he had indicated to police that he had seen *one* of the "Lassiters" at the YMCA on the day of the murder. However, Williams had testified at a previous hearing that the only defendant he had seen at the YMCA that day was Hazard. At the suppression hearing he recanted, saying that it was not Hazard. Moreover, in his second statement he had indicated that he knew defendants because he had seen *all* of them at the YMCA on the previous day.

Williams testified on cross-examination that he never read the affidavit, but instead had only looked at it, signed it, and left the office. However, he also testified that despite not reading the statement, he told defense counsel that he was changing his earlier story about Hazard's being involved in the murder. Williams also testified that the state had not made him any

promises in exchange for his truthful testimony.

Before the suppression hearing could begin for the second day, the trial justice held a conference in his chambers to discuss whether the court should continue to hold Williams without bail during the hearing and trial. The trial justice called in defendants' counsel to apprise them of the situation. At that time, Hazard's counsel indicated that he visited the ACI on the previous evening and saw Lassiter in the visiting room. Lassiter allegedly told Hazard's attorney that upon arrival at the ACI, he and Williams had been in the same holding cell. Williams allegedly told Lassiter, and a variety of others, that none of the three defendants was responsible for Andrews's murder. The trial justice advised the defense attorneys to go to the courthouse holding cells, speak with their clients and obtain the names of any of the people who allegedly heard Williams make this statement. He also advised the prosecutor to discuss the matter with Williams. After Lassiter's attorney returned with two names, the suppression hearing was reconvened to question Williams about the new alleged recantation.

At the suppression hearing, Williams confirmed that he had been in a holding cell with Lassiter. He confirmed that there were others present and that conversations did take place about the shooting on July 18, 1996. He also testified that although he did not know what it meant, at Lassiter's request, he agreed to "plead the Fifth." Lastly, Williams stated that Lassiter did not threaten him in any way.

King also testified consistently with the facts as stated above because she stated that she did not see Williams with Andrews on the evening of the murder.

After considering all the testimony, the trial justice denied Hazard's motion to suppress Williams's testimony. In doing so,

he attributed Williams's failure to initially identify defendants as the result of fear. Notwithstanding King's testimony, he found that Williams was present at the time of the murder and able to observe and identify each defendant. Most importantly, the trial justice stated that Williams's credibility was for the jury to decide. The jury could make its decision after cross-examination revealed inconsistencies in Williams's testimony.

On appeal, Hazard argues that the trial justice improperly credited Williams's explanation for his inconsistent identifications, and that he failed to understand his role in evaluating the suppression motion. Hazard maintains that because Williams failed to initially identify him, and later recanted his second identification, his testimony was so lacking in credibility that it should not have been admissible. The state, on the other hand, responded that Hazard's complaints about the denial of the suppression motion have been waived because Hazard failed to raise this credibility argument at trial.

■■■ "It is axiomatic that 'this [C]ourt will not consider an issue raised for the first time on appeal that was not properly presented before the trial court.'" *State v. Oliveira*, 774 A.2d 893, 924 (R.I.2001) (quoting *State v. Breen*, 767 A.2d 50, 57 (R.I.2001)). In this case, the trial justice clearly understood the basis of Hazard's challenge to Williams's testimony. In his ruling on the motion to suppress Williams's identification, the trial justice stated:

"Defendants *** focus upon [Williams's] credibility due to the fact he initially gave a statement that he could not identify the perpetrators, but later gave another statement in which he identified the three defendants. Still later he executed an affidavit recanting the identifi-

cation of one of the persons previously identified. *** All of this, defense counsel argues, goes to his credibility, and they urge the [c]ourt to suppress his identification because of it."

Therefore, we reject the state's "raise-or-waive" argument and address the merits of Hazard's first challenge.

■ "We will reverse a trial justice's findings on a motion to suppress only if (1) his or her findings concerning the challenged [testimony] reveal clear error, and (2) our independent review of the conclusions drawn from the historical facts establishes that the defendant's federal constitutional rights were denied." *State v. Garcia*, 743 A.2d 1038, 1044 (R.I.2000) (citing *State v. Humphrey*, 715 A.2d 1265, 1273 (R.I.1998)). In this case, the trial justice found that Williams was a credible and reliable witness. Specifically, the trial justice found that Williams's testimony was believable, despite the changed and recanted statements, because they could be attributed to fear of repercussions. The trial justice determined that inconsistencies in Williams's testimony were for the jury to resolve, as the final arbiter of witness credibility.

■ The trial justice further found that Williams was competent to give an account of the events because he concluded that Williams could have been present at the murder scene, despite King's testimony to the contrary. The trial justice determined that there was enough time for Williams to join Andrews before the shooting began.[3] The trial justice determined that Williams had ample opportunity to view defendants,

and that based on his previous contact with each of them, was able to make a competent identification. We perceive no clear error in the trial justice's factual findings. We credit the trial justice's finding, because "[i]n a situation in which the question of a witness's *** competency is close (that is, the jury could find that the witness perceived the matter testified to), the judge should admit the testimony since the matter then becomes one of credibility and is properly for the jury." *State v. Mendoza*, 709 A.2d 1030, 1035 (R.I.1998) (quoting *State v. Ranieri*, 586 A.2d 1094, 1098 (R.I.1991)). This principle is even more powerful when it involves a criminal case and the defendant is the proponent of the suppression motion. *See Ranieri*, 586 A.2d at 1098 (citing 3 J. Weinstein & M. Bergen, ¶ 602[02] at 602–10 (M.B. 1988)). Hazard's attempt to draw an analogy to *Ranieri* is misplaced. *See State v. Vanover*, 721 A.2d 430, 436 (R.I.1998); *Mendoza*, 709 A.2d at 1034; *State v. Gatone*, 698 A.2d 230, 236 (R.I.1997). Despite its weaknesses, Williams's testimony reveals that his ability to perceive the events was far superior than that of the eyewitness in *Ranieri*.

Hazard also argues that the trial justice erred by rejecting Williams's recantation. By finding that Williams's inconsistent statements were the product of fear, the trial justice impliedly rejected the recantations contained in the affidavit and Williams's holding-cell statements to Lassiter. We have said that "[w]hen the testimony of the recanting witness is contra-

---

**3.** Hazard argues that Williams's identification was both incredible and unreliable. At the same time, he expressly states that he is not challenging the identification procedures, but rather Williams's ability to perceive the events, based on this Court's previous decision, in *State v. Ranieri*, 586 A.2d 1094, 1098 n. 4 (R.I.1991). In *Ranieri*, we stated that

"[t]here is no legal objection in regard to identifications based on 'unreliability' per se." *Id.* We determined that when a defendant couches his argument as one based upon "reliability," we treat it as a challenge under Rule 602 of the Rhode Island Rules of Evidence, better known as a "competency" argument. *Id.*

dicted by other witnesses, by facts and circumstances, and by their prior statements, the trial justice is justified in finding those recantations incredible." *Fontaine v. State*, 602 A.2d 521, 525 (R.I.1992) (citing *Correia v. Norberg*, 120 R.I. 793, 800, 391 A.2d 94, 98 (1978)). In *Fontaine*, we upheld the trial justice's decision to reject the recanting testimony because "the trial justice was presented with conflicting testimony and evidence, [thus,] he was able to make sound credibility findings by assessing the facts and the totality of the circumstances before him." *Id.* at 525–26.

In this case, the trial justice could infer that Williams's recantation was incredible because of the facts and circumstances, namely that he was pressured to change his story to protect himself. Thus, the trial justice was permitted to reject the recantation under *Fontaine*.

We conclude that the trial justice did not clearly err by denying Hazard's motion to suppress, and that there is no evidence that his federal constitutional rights were denied. To the extent that Hazard attempts to persuade this Court that the trial justice must act as a credibility gatekeeper before permitting every witness to testify, we find this argument wholly without merit. Thus, Hazard's first argument is denied.

### III

### First Motion for a New Trial

One week after the jury returned its guilty verdict, Hazard filed a motion for a new trial pursuant to Rule 33 of the Superior Court Rules of Criminal Procedure, arguing that the verdict was against the law and the weight of the evidence. At the hearing on August 11, 1998, Hazard's attorney argued that a new trial must be granted because Williams was the only

witness who placed Hazard at the scene of the crime and that he repeatedly had changed his story. Thus, he asserted that Williams's testimony had serious credibility problems. Further, the other witnesses produced by the state corroborated only the occurrence of a murder, and not Williams's identification testimony. Finally, Hazard's attorney mentioned additional witnesses who were not present at trial and who could provide additional support for Hazard's alibi defense.

In opposition, the state challenged Hazard's motion for a new trial, to the extent that he was arguing that the testimony of the additional witnesses constituted "newly discovered evidence." The state argued that Williams's testimony was, in fact, credible, and that as long as reasonable minds could differ on the believability of the state's case, the trial justice was obligated to deny Hazard's motion. The state also contested the credibility of Hazard's alibi, arguing that the jury must have accepted the state's theory that the Ohio trip was made on the morning after the murder. The trial justice denied Hazard's motion.

We consistently have repeated that in reviewing a motion for a new trial, the trial justice "acts as a thirteenth juror and exercises independent judgment on the credibility of witnesses and on the weight of the evidence." *State v. Golembewski*, 791 A.2d 468, 470 (R.I.2002) (quoting *State v. Banach*, 648 A.2d 1363, 1367 (R.I.1994)). If the trial justice finds that "the evidence is balanced or that reasonable minds could differ, then the motion for a new trial must be denied." *Id.* Further, "this Court will not disturb the decision unless the trial justice has overlooked or misconceived material evidence or was otherwise clearly wrong." *Id.* (quoting *State v. Luanglath*, 749 A.2d 1, 4 (R.I. 2000)).

■ On appeal, Hazard argues that the trial justice did not conduct a sufficient review of the evidence, that he erred by finding that reasonable minds could disagree about Williams's credibility, and that he failed to evaluate why Williams's testimony was capable of sustaining the verdict. In rejecting Hazard's initial motion for a new trial, we conclude that the trial justice conducted the appropriate analysis. The trial justice, recognizing Hazard's complaint about Williams's credibility, stated that regardless of Williams's inconsistent statements, a reasonable jury could have relied on his identification of Hazard because Williams gave a credible explanation for his behavior, namely, that at various times he was afraid to tell the truth. More importantly, the trial justice noted that not only did the jury find Williams to be truthful, but he found the same in his independent evaluation.

The trial justice also noted that regardless of the number of alibi witnesses presented by Hazard, it was entirely possible for the jury to have believed Williams instead of the totality of the defense witnesses. The trial justice aptly noted that Williams was credible because he testified about several facts that he could not have known about unless he was present at the murder scene. Specifically, he testified that Andrews was not wearing a shirt when he was shot, that he fell into the bushes, which accounted for the grass found in his hair, and that Lassiter's firearm was louder than Hazard's. In sum, the trial justice found that reasonable minds could have differed on the evidence against Hazard, that sufficient evidence supported each charge against Hazard,

and that because the verdicts served the ends of justice, they must stand.

Hazard has failed to demonstrate that the trial justice overlooked or misconceived material evidence or was otherwise clearly wrong in making his determination. Thus, we deny Hazard's second argument.

## IV

### Second Motion for a New Trial

At trial, Hazard's alibi defense was that he had been in Ohio visiting relatives on the night of the murder. His mother Trenda Hazard (Trenda) testified that at approximately 7 a.m. July 18, 1996, she was preparing to leave for Ohio to visit a friend, Charlene Brenner (Charlene).[4] Trenda testified that Hazard's girlfriend, Toni Fortes (Fortes), rented a brown car for the trip.[5] Trenda was a passenger in a second car, a white Dodge Intrepid, driven alternatively by her brother Carlton Hazard (Carlton) and a family friend, Franklin Dean (Franklin). Trenda stated that Hazard traveled in the Taurus, with his brother Kyle Hazard (Kyle) and their cousin Dennis Marrow (Marrow). Trenda testified that they arrived at Charlene's house at approximately 8 p.m. that evening, stayed for the weekend, and departed on the following Tuesday.

Fortes also testified that Hazard left for Ohio on July 18, 1996. She rented a car for the group approximately one week before the trip because she planned to go with them. Fortes did not accompany the group, however, because her daughter contracted chicken pox shortly before the trip. The rental agreement was admitted to show that the vehicle had been driven

---

4. Charlene Brenner's last name is spelled Brunner in many places within the record. However, we adopt the spelling used by Trenda Hazard when asked by the court reporter to spell the name for the record.

5. Hazard's brother Kyle Hazard (Kyle) later identified the vehicle as a brown Ford Taurus.

approximately 2,700 miles between July 11 and July 24, 1996. Kyle testified that he left with Hazard on July 18, 1996, and traveled to Ohio. He testified that Hazard was in the brown Taurus with him for the entire trip and that at approximately the same time the murder occurred, Hazard was in Ohio, at Charlene's house.

Several witnesses testified that they saw Hazard in Ohio. Victoria Perry (Victoria), Charlene's sister, testified that she went to Charlene's house on the evening of July 18, 1996, to visit with friends from Providence and confirmed that Hazard was at Charlene's house that evening. Charlene also testified that Hazard was at her house on the evening of July 18, 1996. Finally, David Lane (Lane) testified that on July 18, 1996, he received a phone call from Hazard announcing his arrival in Ohio and went to Charlene's house to see him. Lane planned a fishing trip for several of the men on his friend Edward Stewart's (Stewart) boat. He testified that on the night of July 19, 1996, the group departed for the fishing trip and returned on July 20, 1996.

The prosecutor sought to discredit each of the alibi witness's stories by challenging them on the date of the group's departure. In closing, the prosecutor argued that:

> "the [s]tate's theory is, and I'm asking you to believe this, is that *** yes, a trip took place, but when did they take off[?] *** I suggest to you that the alibi was planned during the course of the night on the 18th going into the 19th, and that they left the morning of the 19th and arrived Friday the 19th."

After the jury gave its verdict and the first motion for a new trial was denied, Hazard retained new counsel. In November 1998, the Providence Police Department was ordered to reopen Hazard's case and reinvestigate, based on additional alibi evidence reported in the Journal. Hazard filed a second motion for a new trial, based on newly discovered evidence, in December 1998.

Hazard asked for a new trial to present evidence that on the morning of the murder his vehicle was stopped by a New Jersey state trooper. The motion was accompanied by an affidavit signed by Hazard, stating that before the trial he had advised his original attorney of the New Jersey traffic stop and that he relied on his attorney to investigate the existence of any records pertaining to the stop. Hazard also asked for a new trial to present the testimony of Mustafa Muhammed Abdullah Ali (Ali) who allegedly witnessed the shooting and saw the assailants, but chose not to come forward and make a statement.

The trial justice held a hearing on the second motion for a new trial in September 1999. Hazard presented five new witnesses. They testified either that Hazard was in Ohio on the night of the murder, or that they had seen him sometime that weekend in Ohio.

Hazard also called Ali, who testified that he knew Andrews because he had been his basketball coach. On the day of the murder, Ali was standing on the corner of Pearl Street and Providence Street with Andrews and some others at approximately 6:30 p.m. Ali recalled that a burgundy-colored Taurus approached them as they stood on the corner. As the vehicle slowed down, Ali saw Lassiter yell from the vehicle: "[Andrews], get your gun. You're going to die tonight." Ali testified that although he also saw a person named Dave (presumably Roberts) in the vehicle, he was certain that Hazard was not in the vehicle. Afterward, Andrews left the group, while Ali and the group stayed at the corner. Late that evening Ali saw a person walking alone on West Clifford Street. He then saw the same Taurus

drive by the person and heard gunshots fired. He ran to where the person had been standing and discovered that Andrews had been shot. At no time did Ali see Williams.

Hazard also presented New Jersey State Trooper Kevin Vieldhouse (Trooper Vieldhouse). Trooper Vieldhouse's daily activity patrol log (patrol log) for Thursday, July 18, 1996, revealed that at 10:27 a.m., he stopped a vehicle traveling west on Route 80 in New Jersey with Massachusetts license plate 445–XEE, the vehicle rented by Fortes. The patrol log indicated that the vehicle contained three black males, one of whom was identified as Kyle by the written warning issued to him. Trooper Vieldhouse testified that because he didn't have any independent recollection of the stop, which occurred more than two years before the hearing, or any additional written notes, he could not say whether Hazard was one of the other two black males in the vehicle. He also testified that he had not been contacted about the stop until the fall of 1998, when the Journal reporter contacted him for the information. He eventually was contacted by representatives of the Providence Police Department.

The state presented three witnesses to impeach Ali's testimony that Williams was not present at the murder scene. The first, Ira Nasberg (Nasberg), brought a videotape from a local television station and played it for the trial justice. Nasberg's four-minute videotape showed clips of the murder scene. After watching the videotape, Det. Muir testified that Williams was captured on the videotape, and therefore was present at the scene. Detective Cassidy confirmed that one of the people that Ali said was at the scene was on the videotape. However, Det. Cassidy testified that he did not see Ali at the murder scene, but did see Williams.

The state also called Fortes, a hostile witness, to discuss a telephone conversation that she had with Hazard while he was incarcerated at the ACI. The transcript of the recording revealed Hazard's telling Fortes that Trooper Vieldhouse had not given Kyle, Marrow, or himself a written warning reflecting the New Jersey traffic stop. Hazard indicated that if Kyle had gotten a written warning, he would not have said that he was driving, but instead would have said Kyle was driving.

Also discussed at the hearing were two firearms that had been recovered in March 1999 from a home at 211 Linwood Avenue in Providence, after a drug-related arrest. Detective Badessa testified that the firearms appeared "weathered," and were of the same caliber as those involved in the Andrews murder. The suspects arrested at the scene included Jackson, James Lassiter and Roberts. Detective Badessa forwarded the weapons to the Rhode Island State Crime Laboratory (state crime lab) for comparison to the shell casings from those recovered at the Andrews murder scene. Before the close of the hearing, the parties stipulated to admit the report from the state crime lab.

In December 1999, the trial justice gave a written decision denying Hazard's motion. Our standard of review of a decision on a motion for a new trial based on newly discovered evidence is well settled.

" 'When a motion for a new trial is based on newly discovered evidence, that evidence must satisfy a two-pronged test.' *** The first part is a four-prong inquiry that requires that the evidence be (1) newly discovered since trial, (2) not discoverable prior to trial with the exercise of due diligence, (3) not merely cumulative or impeaching but rather material to the issue upon which it is admissible, (4) of the type

which would probably change the verdict at trial. \*\*\* Once this first prong is satisfied, the second prong calls for the hearing justice to determine if the evidence presented is 'credible enough to warrant a new trial.' \*\*\* [T]his Court will not disturb the decision of a trial justice on a motion for a new trial unless he or she overlooked or misconceived relevant and material evidence or was otherwise clearly wrong." *State v. L'Heureux*, 787 A.2d 1202, 1207–08 (R.I. 2002) (quoting *State v. Gomes*, 690 A.2d 310, 321 (R.I.1997) and *State v. Hernandez*, 641 A.2d 62, 72 (R.I.1994)).

■ We first address the "newly discovered" alibi evidence presented by Hazard. Hazard presented testimony from John Dean (John), an Ohio friend, who testified that he accompanied Hazard on the July 19, 1996 fishing trip. Stewart, the owner of the boat, testified that he spoke to Hazard on the telephone on July 18, 1996, and that Hazard was at Charlene's house. He also testified that he saw Hazard on the fishing trip. Conchita Brenner (Conchita) testified that she saw Hazard on July 18, 1996, in Ohio. Lastly, Temple Stevens (Stevens) testified that she saw Hazard on the morning of July 18, 1996, and he told her that he was going to Ohio. The trial justice rejected the testimony of each of these witnesses because it was not newly discovered or available since the trial. Further, the trial justice found it cumulative and unlikely to alter the verdict at a new trial. We agree.

Each of these witnesses was known to Hazard at the time his original defense was being prepared. Because it was undisputed that he went to Ohio, if Hazard had indeed seen any of these people before or during his visit, he clearly would have

known it, and if he wished for them to support his alibi defense he could have contacted them and presented them at the trial. Further, their testimony did not add any evidence to that already presented by Hazard's original group of alibi witnesses. Thus, the trial justice properly rejected their testimony.[6]

■ Hazard also presented Trooper Vieldhouse's testimony, along with the patrol log and warning. The trial justice rejected Trooper Vieldhouse's testimony because he found it was not newly discovered or available since trial, that it was cumulative and not material or likely to affect the jury verdict. Although we disagree with the trial justice's finding that the traffic stop evidence was cumulative and immaterial, we nevertheless, sustain his decision.

First, the character of Trooper Vieldhouse's evidence was markedly different from the testimony of other alibi witnesses. His patrol log was the single piece of independent unbiased documentary evidence which might have corroborated the defense position that the group had gone at least as far as New Jersey on the morning of the murder. This evidence directly contradicted the state's theory that the group had departed the following day. Therefore, it was clearly not cumulative or immaterial. Furthermore, if the jurors had accepted the patrol log, they could have believed that the Ohio trip had occurred on Thursday morning, that three black males traveled in the vehicle that Hazard was supposedly in, and that Hazard's brother Kyle was one of those men. This would have permitted the jury to draw the inference that Hazard also was in the vehicle, contrary to the state's argu-

---

**6.** It appears that the trial justice did not address the impact of John's testimony in his written decision. However, because it is clear to this Court that his testimony was of the same quality as the other "new" familial alibi witnesses, the omission is harmless.

ment that the group had departed the following day. As the prosecutor himself admitted, had the traffic stop evidence been presented, the trial "would *** have come to a screeching halt."

However, this is insufficient to warrant a new trial. Although the evidence is material and not cumulative, it must also be "newly discovered" since the first trial. Because the trial justice did not err in finding that the traffic stop evidence was not newly discovered, we must sustain the trial justice's finding. *L'Heureux*, 787 A.2d. at 1207. Specifically, Hazard's affidavit accompanying the motion for a new trial acknowledges that he knew of the traffic stop before the first trial. Moreover, Hazard also has failed to demonstrate that he exercised the requisite degree of diligence to obtain the evidence. Trooper Vieldhouse testified that if Hazard simply had placed a phone call to any New Jersey state police barracks, Hazard could have investigated and obtained documentary evidence to support his argument. This obviously is true because the evidence eventually was retrieved in this manner. Hazard's failure to demonstrate due diligence renders this Court incapable of providing Hazard with any redress at this time. *See State v. Brown*, 619 A.2d 828, 833 (R.I.1993) (rejecting claim when evidence could have been obtained by single phone call); *State v. Sullivan*, 83 R.I. 1, 3–4, 111 A.2d 838, 840–41 (1955) (rejecting claim based on defendant's own bus ticket stub).

If Hazard was indeed in the vehicle that morning, frankly, this Court is at a loss to understand why he neglected to pursue documentation of the stop immediately after being charged with Andrews's murder. Furthermore, it puzzles this Court that

none of the others who traveled to Ohio, (Kyle, Marrow, Trenda, Franklin, and Carlton), came forward and mentioned the stop at the bail hearing or at any other time during the first trial. This Court cannot turn back the clock.

Hazard attempts to explain his failure by implicitly blaming his first attorney, stating that he relied on his attorney to "follow up and further investigate" the traffic-stop records. To the extent that Hazard attempts to blame his first attorney, that complaint was not raised before the trial court and thus, may not be addressed by this Court. Further, the issue more properly is addressed via a petition for post-conviction relief. *See United States v. Nero*, 733 F.2d 1197, 1207 & n. 7 (7th Cir.1984); *Brennan v. Vose*, 764 A.2d 168, 172 (R.I.2001) (defendant claims attorney's failure to investigate certain alibi witnesses constituted ineffective assistance of counsel).

Hazard further argues that any attempts to discover the traffic-stop records would have been futile because, according to New Jersey State Police policy, warnings are destroyed within thirty days, a period in which Hazard was incarcerated and had not yet been indicted. This argument is unavailable to Hazard, however, because he made no attempt to obtain this evidence. *See State v. Lanoue*, 117 R.I. 342, 348, 366 A.2d 1158, 1161–62 (1976) (rejecting defendant's argument that evidence could not be obtained because source now testifies that at the time of trial, attorney had instructed him not to speak of the matter). In this case, no effort was made either by him or on his behalf to inquire of the traffic stop until two years later, well past the thirty-day destruction rule of the New Jersey State Police.[7] It would make no sense to permit

---

7. Moreover, the practice of the New Jersey State Police was to keep the patrol log that

recorded the actual stop for two years.

him to rely on a policy that he had no knowledge of at the time.

Thus, we reject Hazard's argument relating to Trooper Vieldhouse's testimony and physical evidence because he knew of the evidence at the time of the trial, and failed to exercise due diligence to recover any documentation of the stop that would have indeed bolstered his alibi defense. Finally, we note that even if Trooper Vieldhouse was permitted to testify at a new trial, he made clear that he could not say whether Hazard was indeed in the vehicle that day. Thus, the jury could have believed that although some of the family members went to Ohio that day, Hazard did not.

Hazard also challenges the trial justice's refusal to grant a new trial based on two pieces of evidence that the trial justice determined to be newly discovered.

■ The trial justice determined that Ali's testimony was newly discovered because he had not made himself known or available until after Hazard's trial. We agree with this finding. The trial justice also found that Ali's testimony was material to the issues at trial. Again, we agree.

Ali's testimony concerned two important events on the evening of the murder. First, he testified that he had seen the vehicle used in the murder earlier in the evening and that Hazard was not in the vehicle at that time. Second, he testified that he had seen Andrews moments before the murder (even closer to the time of the shooting than King allegedly had seen him) and that Andrews was alone. He then stated that he heard the shots fired, and when he responded to the scene of the murder, Williams still was not present. Neither of the pieces of information was cumulative, and both were material to the issue of whether Williams was actually with Andrews before and during the shooting.

The trial justice declined to issue a new trial based on the testimony that Hazard was not in the vehicle earlier that evening because he found that it was unlikely to change the outcome of the trial. The trial justice reasoned that Hazard could have joined the occupants between Ali's sighting and the time of the murder. The trial justice then indicated that Ali's testimony would "buttress rather than refute the testimony of Williams that he viewed four individuals in the motor vehicle at the time of the murder, and identified three of [them]" as Hazard, Lassiter and Roberts. Moreover, the trial justice determined that Ali's testimony that he supposedly saw Andrews seconds before the shooting was "not credible enough" to warrant a new trial. The trial justice did not overlook or misconceive material evidence in declining to issue a new trial based on Ali's testimony.

■ Lastly, Hazard challenges the trial justice's refusal to grant a new trial based on the newly discovered ballistics evidence. The ballistics analysis was performed by Robert A. Hathaway (Hathaway), a firearms and tool mark examiner from the state crime lab. Hathaway reported that the .45–caliber casings found at the scene of the murder were fired from a single .45–caliber weapon. He compared the .45–caliber casings to the .45–caliber firearm recovered from Linwood Avenue and concluded that the Linwood .45–caliber firearm was used in the Andrews murder. Hathaway then compared the .22–caliber casings to the .22–caliber Linwood firearm. He found that the .22–caliber casings were at one time chambered in the .22–caliber firearm from the murder scene, but could not positively identify them as having been fired from that weapon.

The trial justice found that although the ballistics evidence was newly discovered, it

was unlikely to have any effect on the verdict. The trial justice made his finding based on the fact that the ballistics evidence corroborated Williams's trial testimony. Further, he found that "the fact that these firearms were seized from the premises of a Lassiter family member is not sufficient to justify this Court's granting a new trial." Although it appears that the discovery of the murder weapon would have permitted the jury to infer that the weapons belonged to one of the men at Linwood on the day of the seizure, it is equally possible for them to conclude that it was used by Hazard and given to one of the men. Thus, we agree that the ballistics evidence was unlikely to alter the verdict at trial.

## V

### Scope of Cross–Examination

Hazard argues that his Sixth Amendment right of confrontation was unduly restricted by the trial justice because he failed to permit Roberts's attorney to cross-examine Williams about his "deal" with the prosecution. We disagree.

In May 1998, Williams met with his probation officer. During the meeting, the prosecutor arrived unexpectedly, accompanied by a Providence police detective, and served Williams with a subpoena to testify at Hazard's murder trial. On June 10, 1998, Williams failed to appear, and was given notice of a Super.R.Crim.P. 32(f) probation violation. At that time, the prosecutor told Williams that if he appeared at the trial, rescheduled to begin on June 15, 1998, and testified truthfully, the Rule 32(f) notice would be withdrawn.

At trial, Hazard's attorney questioned Williams about the probation violation. The jury heard that Williams was given the violation notice and that he agreed to appear in exchange for the withdrawal of

the violation. At the close of this line of inquiry, the prosecutor read a stipulation stating that "when [ ] Williams was presented with a 32(f) violation, he was promised if he came to court to testify at trial truthfully, the 32(f) would be withdrawn." At that time, defense counsel voluntarily began another line of questioning.

Later, Roberts's attorney began a similar line of inquiry. After several questions leading up to the probation violation, Roberts's attorney asked Williams whether the prosecutor "told [him] that if [he] didn't cooperate with [the prosecutor], with the state, and the prosecution of this case, [and] *** insisted on testifying as [he did] in the affidavit, that [he] would go to jail; isn't that right?" The prosecutor objected and the trial justice sustained the objection. The trial justice then called a chambers conference to discuss an unrelated matter. After the conference and lunch break, Roberts's attorney resumed his questioning of Williams. Roberts's attorney further discussed the probation violation notice with Williams, absent interruption, until he had exhausted his line of questioning. Roberts's attorney then finished his examination of Williams.

Hazard now contends that because the trial justice excluded Roberts's attorney's first question relating to the "deal," Hazard was deprived of his right to fully cross-examine Williams to expose his bias. We disagree.

■ A criminal defendant has a fundamental right to confront his accusers under the Sixth Amendment of the United States Constitution. *See State v. Parillo,* 480 A.2d 1349, 1356 (R.I.1984). "[T]his right should be vigilantly guarded when a defense counsel challenges the scope of cross-examination that he was afforded by a trial justice in his questioning of the prosecution's sole eyewitness to an alleged crime." *Id.* at 1357. Since a

sole eyewitness's credibility is often the " 'pivotal element' in the state's case against defendant[,] *** [t]he trial justice may not totally prevent the defendant from exploring the issues of motive, bias, or prejudice in the testimony of the state's chief witness." *Id.* (quoting *State v. Freeman*, 473 A.2d 1149, 1153 (R.I. 1984)). If the trial justice does so, he or she commits an error of both federal and state constitutional magnitude. *See id.*

■ This Court has adopted a *per se* error rule only when a trial justice "totally precludes cross-examination by defense counsel of the state's key witness on the issues of motive or bias." *Parillo*, 480 A.2d at 1357 (citing *Freeman*, 473 A.2d at 1154). In cases in which "the restricted line of inquiry would not have weakened the impact of the witness'[s] testimony," we apply a harmless error analysis. *Id.* at 1358 n. 5 (quoting *Springer v. United States*, 388 A.2d 846, 856 (D.C.App.1978) and *State v. DeBarros*, 441 A.2d 549, 552 (R.I.1982)).

■ In the instant case, after looking at the entire transcript to assess the scope of Hazard's cross-examination of Williams on the Rule 32(f) issue, it is clear that the trial justice's discretion was exercised consistently with the Sixth Amendment. First, Hazard fails to recognize that his attorney was permitted to inquire at length about the circumstances surrounding Williams's failure to appear, the violation, and his subsequent appearance. Furthermore, he stipulated to the prosecutor's statement that permitted the jury to draw the inference that Williams's testimony may be biased, which is the purpose of the cross-examination Hazard claims to have been deprived of. Apparently, the jury chose not to believe that Williams's testimony was biased, perhaps believing Williams's testimony that he failed to maintain contact with the prosecutor because he did not want to suffer the same fate as his cousin Andrews.

■ Hazard, however, contends that under the Sixth Amendment, Williams was required to answer one particular question asked by Roberts's attorney. Hazard's contention is without merit because he "lacks standing to raise any alleged violation of the codefendant'[s] *** constitutional rights." *State v. Valenti*, 772 A.2d 127, 130 (R.I.2001). Furthermore, even if the trial justice was mistaken when he initially sustained Roberts's attorney's question, Roberts's attorney was permitted to continue and to conclude his line of questioning after lunch. This rendered the initial mistake harmless. *See Oliveira*, 774 A.2d at 922. Importantly, both attorneys voluntarily terminated or changed their line of questioning, absent direction or limitation by the trial justice. Thus, we reject Hazard's Sixth Amendment argument.

# VI

## The Reasonable Doubt Instruction

■ Hazard next argues that the trial justice issued an erroneous instruction on the law of reasonable doubt.[8] Specifically,

---

**8.** The trial justice's instruction was as follows. "In this case, as in every criminal case, if you are to find the defendant guilty of any of the charges against him, the state must prove the guilt of the defendant *** by proof which is beyond a reasonable doubt ***.

"I've used the term several times today and previously 'beyond a reasonable doubt.'

Now, just what does that mean? Proof beyond a reasonable doubt does not mean proof of the essential elements of the crime charged beyond all doubt, and it doesn't mean beyond a shadow of a doubt. *** "Reasonable doubt is not a fanciful or speculative doubt, nor is it a doubt arising out of whimsy or caprice. It must be something more than that. A reasonable doubt

Hazard argues that the portion of the instruction that stated he was "not entitled to the benefit of any and all doubt" easily could have been interpreted to require a level of proof lower than the constitutional mandate.[9] Furthermore, Hazard's attorney requested that the trial justice employ the specific language "well-settled conviction of guilt" versus "convinced" in reference to the state of mind required for reasonable doubt.

The standard of review for jury instructions is well settled. "The charge given by a trial justice need only 'adequately cover [ ] the law.'" *State v. Krushnowski,* 773 A.2d 243, 246 (R.I.2001) (quoting *State v. Grundy,* 582 A.2d 1166, 1170 (R.I.1990)). As long as the instructions "neither reduce nor shift the state's burden of proof" we sustain the trial justice's charge as given. *Id.* (citing *State v. Gordon,* 508 A.2d 1339, 1349 (R.I.1986)). "On review, we examine the instructions in their entirety to ascertain the manner in which a jury of ordinary intelligent lay people would have understood them, *State v. Gomes,* 604 A.2d 1249, 1256 (R.I.1992), and we review challenged portions of jury instructions 'in the context in which they were rendered.' *Gordon,* 508 A.2d at 1349." *Krushnowski,* 773 A.2d at 246.

We have examined the jury charge on reasonable doubt as a whole and conclude that the trial justice's instruction adequately covered the law. Although the trial justice did give repeated descriptions of what does not constitute reasonable doubt, he also described the converse. In doing so, he advised the jury of the state's burden and Hazard's presumption of innocence. Finally, although Hazard complains that the trial justice did not use his attorney's suggestions for the instructions, "it is not reversible error for a trial justice to refuse to give instructions requested by a defendant, as long as the charge given adequately covers the law relating to the request." *State v. O'Brien,* 774 A.2d 89, 105 (R.I.2001) (quoting *Grundy,* 582 A.2d at 1170). Thus, we reject Hazard's fifth claim of error.

## VII

### The Bible

On the third day of trial, the state called King to the stand to testify. She approached the stand holding a Bible. The two defense attorneys immediately object-

---

is one which is founded in reason based upon the evidence or the lack of evidence. Proof beyond a reasonable doubt exists when after you have thoroughly and conscientiously considered and examined all the evidence that is before you, your mind is left in such a condition that you believe in the correctness of the state's claim that the defendant is guilty of the charges.

"Let me put it another way. If, after you have carefully reviewed and considered all of the evidence in the case, if you are convinced that the defendant did, in fact, do the acts charged by the state, then proof beyond a reasonable doubt has been established. Mere suspicion, however, cannot sustain or justify a verdict of guilty. Simply stated, then, the law provides that the defendant is entitled to the benefit of the doubt based on reason, but he is not entitled to the benefit of any and all doubt."

9. The state argues that Hazard's attorney failed to preserve the reasonable doubt instruction issue for appeal. The state recognizes that Hazard's attorney made a timely objection, but takes exception with whether he sufficiently explained the basis for his objection. The colloquy occurred as follows.

"[Hazard's Attorney]: *** I ask you to exclude the word 'any' because I think, Judge, that word—

"The Court: Denied. Anything else?"

Based on the transcript, we conclude that the trial justice understood Hazard's basis for objection or else he would not have interrupted him and rejected his claim of error.

ed. The trial justice stated for the record that he had asked her to put it aside and that she had "gone ahead." Hazard now argues, although the record is not clear, that the trial justice erred by permitting King to hold the Bible while testifying because it constituted an improper bolstering of, or vouching for, the witness's credibility.

 Impermissible bolstering typically occurs when one witness offers an opinion "concerning the truthfulness of the testimony of another witness ***." *State v. Brown*, 709 A.2d 465, 479 (R.I.1998). This practice is forbidden because witness credibility lies solely within the province of the jury. "Vouching occurs when the government says or insinuates that it has 'special knowledge' that its witness is testifying truthfully." *State v. Chakouian*, 537 A.2d 409, 412 (R.I.1988) (quoting *People v. Buschard*, 109 Mich.App. 306, 311 N.W.2d 759, 764 (1981)). When the vouching or bolstering contains a religious connotation, it is typically "narrowly tolerated." *Commonwealth v. Chmiel*, 777 A.2d 459, 466 (Pa.Super.Ct.2001) (citing *Commonwealth v. Chambers*, 528 Pa. 558, 599 A.2d 630, 643 (1991)); *see also People v. Leshaj*, 249 Mich.App. 417, 641 N.W.2d 872, 874–76 (2002).

In fact, Rule 610 of the Rhode Island Rules of Evidence provides that "[e]vidence of the beliefs or opinions of a witness on matters of religion is not admissible for the purpose of showing that by reason of their nature his credibility is impaired or enhanced." In this case, the trial justice recognized that King's possession of the Bible during her testimony was an attempt to show that she was telling the truth and he thus asked her to put it aside. In our view, permitting King to possess a Bible while on the witness stand invades the province of the jury and was an abuse of discretion. However, since it is unlikely that King's possession of the Bible affected the outcome of the trial, the trial justice's error was harmless beyond a reasonable doubt. Further, it is clear that King's testimony mostly favored Hazard. She testified that she did not see Williams with Andrews before to the murder, which permitted the jury to draw the inference that Williams was not in a position to see the shooting. Because the trial justice's error was harmless beyond a reasonable doubt, we reject Hazard's final argument.

### Conclusion

Accordingly, Hazard's appeal is denied and dismissed. The judgment of the Superior Court is affirmed. The papers in the case shall be remanded to the Superior Court.