Derick HAZARD

v.

STATE of Rhode Island.

No. 2006–325–Appeal.

Supreme Court of Rhode Island.

April 20, 2009.

J. Richard Ratcliffe, Esq., Providence, for Plaintiff.

Aaron L. Weisman, Department of the Attorney General, for Defendant.

Present: GOLDBERG, Acting C.J., FLAHERTY, SUTTELL, ROBINSON, JJ., and WILLIAMS, C.J. (ret.).

## OPINION

Acting Chief Justice GOLDBERG, for the Court.

This case came before the Supreme Court on January 27, 2009, on an appeal by the applicant, Derick Hazard (Hazard or applicant), from the denial of his application for post-conviction relief. On July 17, 1998, a jury found Hazard guilty of first-degree murder, conspiracy to commit murder, and assault with intent to murder. Hazard subsequently appealed to this Court, and we affirmed the judgment of conviction. *State v. Hazard,* 797 A.2d 448 (R.I.2002). On June 6, 2005, Hazard filed an application for post-conviction relief based on the alleged ineffective assistance of his trial counsel. After three days of testimony, the hearing justice issued a written decision in which he denied Hazard's application for post-conviction relief. For the reasons stated in this opinion, we affirm the judgment of the Superior Court.

### Facts and Travel

The facts of this case are discussed at length in *Hazard.* At this stage we will recount only the facts that are necessary to decide this appeal.

On July 18, 1996, David Andrews was shot and killed while walking on West Clifford Street in Providence. A few days later, the Providence police obtained a warrant for Hazard's arrest. After consulting his attorney, Vincent Oddo (Oddo), applicant surrendered himself to the police and, after a bail hearing, Oddo secured applicant's release on bond.

Mr. Oddo continued to represent Hazard for the next two years, up to and including the jury trial that is at issue in this appeal. The foundation of the state's case was the eyewitness testimony of Andre "Bucky" Williams (Williams), who testified that he was walking beside Andrews when two

people in a vehicle began shooting at them. Although Williams was able to escape the gunfire unscathed, Andrews was shot and died from his wounds. At trial, Williams identified Hazard as one of the shooters.

The centerpiece of applicant's trial defense was his alibi; and, in that regard, several family members and friends testified on his behalf that, at the time of the murder, applicant was in Ohio visiting relatives. At trial, however, Hazard did not produce any independent evidence to corroborate his alibi, such as receipts for food or for gas purchases made en route to Ohio; and, more importantly (and pertinent to the present appeal), applicant did not present any evidence showing that during the drive to Ohio, while he was at the wheel, his vehicle was stopped on the highway by a New Jersey state trooper.

After the jury returned a verdict of guilty, applicant filed two motions for a new trial; after the first motion was denied, applicant fired Oddo. The applicant subsequently filed the second motion with his new attorney, alleging that applicant had discovered new evidence that supported his alibi. On September 13, 1999, Kevin Vieldhouse, the New Jersey state trooper who made the stop, testified at the evidentiary hearing. According to his patrol log for July 18, 1996, on the day of the murder, at 10:27 a.m., he stopped a vehicle that was traveling west on Route 80 in New Jersey. Although Vieldhouse's records indicated that the vehicle contained three African–American males, the only person who could be identified from his records was the driver, Kyle Hazard (Kyle), to whom Vieldhouse issued a written warning. Notably, Vieldhouse could not recall whether Derick Hazard was among the three people in the car. The

trial justice denied the motion for a new trial, and applicant subsequently appealed to this Court.

On appeal, we disagreed with the trial justice's finding that the evidence of the traffic stop was cumulative and immaterial; rather, we concluded that Vieldhouse's patrol log "was the single piece of independent unbiased documentary evidence which might have corroborated the defense position that the group had gone at least as far as New Jersey on the morning of the murder." *Hazard,* 797 A.2d at 464. "This would have permitted the jury to draw the inference that Hazard also was in the vehicle, contrary to the state's argument that the group had departed the following day." *Id.* at 464–65. But because we were of the opinion that the evidence could not be characterized as "newly discovered," we sustained the trial justice's finding. *Id.* at 465. To the extent that applicant blamed Oddo for allegedly failing to investigate the stop, we advised applicant that his contention properly could be raised by way of a civil action for post-conviction relief; and, after considering his other arguments, we affirmed his conviction.

On June 6, 2006, Hazard filed an application for post-conviction relief based on the alleged ineffective assistance of trial counsel; specifically, Hazard claimed that Oddo failed to investigate whether the New Jersey state police had records to support his alibi defense that he was not in Rhode Island at the time of the murder.

At the hearing on Hazard's application,[1] Oddo testified that applicant had told him that he was in Columbus, Ohio at the time of the murder. The applicant did not, however, provide Oddo with any specific

---

1. The parties agreed to expand the record to include the testimony given at the bail hearing, the trial, and the hearing on the second motion for a new trial, as well as the exhibits that were admitted in full during Vieldhouse's testimony.

details about his journey to Ohio. According to Oddo, Hazard told him that he and members of his family traveled to Ohio in two cars, and stopped only for food and gas. Oddo was unsure when Hazard first told him about the traffic stop, but he recalled that it could have been immediately before, during, or at the end of the trial. However, because Hazard once again failed to provide details—such as the city, state, or highway where the stop took place—Oddo decided against seeking a continuance to investigate Hazard's story. Indeed, after representing Hazard for two years, Oddo was so surprised with Hazard's timing and his lack of details about the stop, that he could not give the information any weight. Furthermore, Oddo testified that he was unaware that the traffic stop occurred in New Jersey until after the trial, when in November 1998, The Providence Journal published a series of articles about Hazard's purported alibi defense. On cross-examination, Oddo testified that he never was informed, by applicant or a member of his family, who was driving the car when it was stopped, or whether a citation or warning was issued by the state trooper.

The applicant testified and provided a different version of the information that he allegedly shared with Oddo. He insisted that during his first meeting with Oddo he informed him that he left Rhode Island at 7:30 a.m. on July 18, 1996, and drove to Ohio; that he crossed the George Washington Bridge and was pulled over by a state trooper in New Jersey; and that the state trooper did not issue a warning. According to applicant, although he had suggested to his attorney that they use this evidence to support his alibi, Oddo decided that they could not prove the traffic stop because there was no supporting documentation.

Hazard further testified that before the bail hearing, he and Oddo had discussed the traffic stop in detail. The applicant stated that he was driving a rented Ford Taurus and his brother, Kyle, was sitting in the passenger seat; applicant added that, when stopped, he handed the trooper the rental agreement and Kyle's license because, as he allegedly told the state trooper, his license was suspended. The applicant averred that rather than issue a warning, the trooper simply advised applicant to switch seats with Kyle before they traveled any further.

During cross-examination, applicant was asked to explain why Kyle had testified at the bail hearing that he was driving and that applicant was sitting in the back seat of the vehicle. The applicant explained that he had been caught driving on a suspended license three times before, and in order to avoid incarceration for two or three years for a fourth offense, he instructed his brother to withhold the fact that applicant was driving. Hazard conceded, however, that during the month before he went to Ohio, he frequently drove around Providence on a suspended license. In fact, although the Providence police had stopped his vehicle, they never charged him with a crime. Furthermore, Hazard admitted that he had failed to explain to Oddo why his brother had testified that he was the driver.

In November 1998, eight months before Vieldhouse testified at the hearing on applicant's second new-trial motion, a reporter from The Providence Journal twice visited applicant at the Adult Correctional Institutions to discuss his alibi. It was during the second visit that the reporter informed Hazard that the New Jersey state police customarily destroyed warnings thirty days after they were issued—and, consequently, she was unable (at least at the time) to locate a warning that would

corroborate the stop. At this point, Hazard told the reporter that when the car was stopped in New Jersey, he was driving. However, on November 12, 1998, The Providence Journal reported that the written warning had been found and that it was issued to Kyle Hazard. At the post-conviction relief hearing, the applicant admitted during his testimony that two days later, during a telephone conversation at prison, he told John Osmond that if he had known that the state trooper had in fact issued a warning to Kyle, he would have changed his story and "switched it around and said [his] brother was driving."[2]

Toni Hazard (Toni), applicant's wife of five years, also testified at the post-conviction relief hearing. She testified that she did not go to Ohio because her daughter was sick with the chicken pox. Toni testified that before applicant was released on bail, she told Oddo about the traffic stop; but because Oddo believed that he had plenty of witnesses to support applicant's alibi, the evidence was unnecessary. Toni also stated that, prior to trial, she and Oddo examined a map in an attempt to pinpoint the location of the stop—an assertion that Oddo squarely denied during his testimony.[3] Furthermore, Toni testified that in January 1997, while applicant was released on bail, she and applicant traveled to Ohio to attend a funeral. She admitted that despite driving through New Jersey and over the George Washington Bridge, they never tried to find the exact location of the stop.

The last witness to testify was applicant's mother, Trenda Hazard (Trenda). She testified that during the trip to Ohio on July 18, 1996, she was in the vehicle traveling behind the car that was carrying her two sons. At applicant's trial, however, Trenda testified that the only stops the travelers made were for food and gas; she never mentioned the traffic stop during her appearances at the bail hearing and subsequent trial, even though she specifically was asked about *any* stops *other than* stops for food or fuel. Likewise, applicant conceded that he never notified Oddo about Trenda's failure to mention the traffic stop.

In a written decision, the hearing justice denied the application based on Hazard's failure to satisfy either prong of the *Strickland* test.[4] The hearing justice concluded that Oddo's recollection of the events surrounding his representation of Hazard was more credible and reliable than the testimony provided by the other witnesses. Of significance to the hearing justice was Hazard's testimony that he had directed his brother to deliberately withhold the fact that Hazard was driving the vehicle; also of significance to the hearing justice was the fact that no one mentioned the traffic stop at the bail hearing or trial, even when specifically asked about any stops the Hazard family made on the way to Ohio. Furthermore, applicant did not tell The Providence Journal reporter that he was driving the rental car until the reporter advised him that the warning could not be located. The hearing justice noted, however, that after The Providence Journal reported that a warning issued to Kyle had been recovered, applicant told John Osmond that if he knew that a written warning had been issued, he would

---

2. John Osmond was a member of the Committee Against Wrongful Conviction and was of the belief that applicant was innocent.

3. Notably, this witness first testified that they studied a map right before trial, two years after the death of Andrews, but subsequently testified that it was around the time of the bail hearing.

4. *Strickland v. Washington,* 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984).

have changed his story and said that Kyle was driving. Equally noteworthy to the hearing justice was applicant's explanation as to why he directed his brother to keep silent about the traffic stop; although applicant testified that he did not want to get in trouble for driving on a suspended license for a fourth time, he candidly admitted that during the month before the murder he regularly drove around Providence, knowing that his license was suspended.

In considering Toni's testimony, which the hearing justice labeled as "ludicrous," the hearing justice maintained that if Toni was so concerned about finding the location of the stop on a map, she and Hazard would have looked for it when they drove to Ohio in January 1997, or on their way back to Rhode Island. Moreover, in juxtaposing her testimony with Hazard's, the hearing justice was convinced that if Hazard had timely provided Oddo with the details of the traffic stop, as Hazard alleged, then there would be no need for Toni to try and locate it on a map.

In contrast, the hearing justice found that Oddo's version of the events of this case was supported by the credible evidence—that is, at best, Oddo first learned about the traffic stop in 1998, immediately before trial and that, even then, as the hearing justice found, "Oddo was not advised of a traffic stop in sufficient detail to either investigate the stop prior to trial or to in good faith request a continuance of the trial." Indeed, the hearing justice concluded that Hazard and his family purposefully and deliberately avoided disclosing the details of the traffic stop to trial counsel.

On April 6, 2007, final judgment was entered in accordance with the hearing justice's decision. The applicant timely appealed to this Court.[5]

### Standard of Review

 The right to seek post-conviction relief "is a statutory right available to a convicted defendant who contends that his original conviction or sentence violated rights afforded to him under the state or federal constitution." *Chalk v. State,* 949 A.2d 395, 398 (R.I.2008) (citing *Young v. State,* 877 A.2d 625, 628 (R.I.2005)); *see also* G.L. 1956 § 10-9.1-1(a) (listing other grounds for post-conviction relief). "In passing on a decision granting or denying post[-]conviction relief, this Court will refrain from disturbing a trial justice's factual findings absent a showing that the trial justice overlooked or misconceived material evidence or otherwise was clearly wrong." *Azevedo v. State,* 945 A.2d 335, 337 (R.I.2008). "However, this Court 'will review *de novo* any post-conviction relief decision involving questions of fact or mixed questions of law and fact pertaining to an alleged violation of an applicant's constitutional rights.'" *Id.* (quoting *Bleau v. Wall,* 808 A.2d 637, 641–42 (R.I.2002)). "[F]indings of historical fact, and inferences drawn from those facts, will still be accorded great deference by this Court, even when a *de novo* standard is applied to the issues of constitutional dimension." *Gonder v. State,* 935 A.2d 82, 85 (R.I.2007) (quoting *State v. Thomas,* 794 A.2d 990, 993 (R.I.2002)).

 It is well settled under Rhode Island law that to prevail on a claim of ineffective assistance of counsel, the applicant must satisfy the two-prong test set forth in *Strickland v. Washington,* 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674

**5.** The notice of appeal was filed on May 15, 2006, six days after the hearing justice issued his written decision on May 9, 2006, but before the entry of final judgment. It is well established by this Court that premature appeals are considered timely. *Azevedo v. State,* 945 A.2d 335, 337 n. 4 (R.I.2008).

(1984). *Rodriguez v. State*, 941 A.2d 158, 162 (R.I.2008). "First, the [applicant] must show that counsel's performance was deficient." *Ferrell v. Wall*, 889 A.2d 177, 191 (R.I.2005) (quoting *Strickland*, 466 U.S. at 687, 104 S.Ct. 2052). "That is, '[the applicant] must show that counsel's representation fell below an objective standard of reasonableness.'" *Id.* (quoting *Strickland*, 466 U.S. at 688, 104 S.Ct. 2052). The performance prong must be assessed in view of the totality of the circumstances and in light of "a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Heath v. Vose*, 747 A.2d 475, 478 (R.I.2000) (quoting *Strickland*, 466 U.S. at 689, 104 S.Ct. 2052). Second, once it has been shown that counsel's performance was deficient, it is incumbent upon the applicant to establish that counsel's representation prejudiced the defense. *Ferrell*, 889 A.2d at 191 (citing *Strickland*, 466 U.S. at 687, 104 S.Ct. 2052). Specifically, the applicant "must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694, 104 S.Ct. 2052. Significantly, the applicant's failure to satisfy either prong will result in the denial of the claim of ineffective assistance of counsel. *Id.* at 700, 104 S.Ct. 2052.

## Analysis

◼ Before this Court, Hazard asserts that Oddo's performance as trial counsel was so deficient as to violate Hazard's constitutional right to counsel. His contention is based on Oddo's failure to investigate the New Jersey traffic stop despite knowing of it before trial. The applicant argues that Oddo's inaction was "palpably unreasonable"; he further argues that, in light of the flawed eyewitness testimony provided by Williams at trial, evidence of the traffic stop would have independently corroborated applicant's alibi and, therefore, would have altered the outcome of the trial.[6]

After a careful examination of the record in this case, we are satisfied that applicant has failed to overcome the strong presumption that Oddo's performance was reasonably professional. *Heath*, 747 A.2d at 478. As applicant points out, the paramount issue before this Court is whether Oddo was apprised of the stop at a point in time that permitted further investigation. At best, according to his testimony, Oddo first learned about the traffic stop just before trial—two years into his representation of applicant. Oddo testified that because Hazard did not provide him with any details surrounding the stop, including the state in which it occurred, and because Hazard waited two years to tell him about it, he refrained from pursuing an investigation and from seeking a continuance.

Although applicant and Toni claimed that they discussed the stop with Oddo in the early stages of the attorney-client relationship, the hearing justice found, and we are hard-pressed to disagree, that the "testimony [of applicant] and that of his family [was] less than convincing as to their claim that Oddo knew about the stop in time to conduct a meaningful investigation, or at least ask for a continuance of the trial." There was not a single word of testimony during the bail hearing in 1996, or at the trial in 1998, about a traffic stop in New Jersey. Indeed, Trenda testified at trial that the only stops along the way were for food and gas. In addition, contrary to applicant's contention that he was

---

6. "It is of course the burden of the state, not of the defendant, to prove every element of the crime, including the defendant's presence and participation therein, beyond a reasonable doubt." *State v. Desmarais*, 479 A.2d 745, 747 (R.I.1984).

driving, Kyle testified at the bail hearing that he drove to Ohio (an averment that is consistent with the police record) and that applicant was in the back seat of the vehicle. The applicant did not inform Oddo that Kyle's testimony was incorrect; rather, he explained during his post-conviction relief testimony that he had directed his brother to withhold information (that is, lie) about the traffic stop because he did not want to be penalized for driving on a suspended license for a fourth time. Given that Hazard admitted that he had driven around Providence on a suspended license merely a month before the trip, however, the hearing justice concluded that Hazard's explanation was incredible.[7]

Our careful review of this record reveals the ever-shifting nature of applicant's story and serves to confirm the hearing justice's conclusion that the information about the traffic stop was withheld and subsequently disclosed only when applicant thought he could safely do so. The applicant did not claim that he was driving the vehicle until The Providence Journal reporter told him that the warning had been destroyed after thirty days and that no citation could be found to corroborate applicant's account of the stop. However, once the newspaper article was published, revealing that the New Jersey state police had, in fact, a record that Kyle Hazard, and not Derick Hazard, had been issued a warning, applicant readily admitted to John Osmond that he had no problem lying—that is, "if the trooper would have said my brother was driving, I wouldn't have said I was, if I didn't want to be truthful, I would have rode with it." Furthermore, at that point, applicant came forth with yet another story about the traffic stop—that he gave the trooper Kyle's driver's license.

In view of the totality of the circumstances, we agree with the hearing justice's conclusion that Oddo was not provided with enough details to investigate the stop before trial or to allow him to make a good faith request for a continuance pending the outcome thereof. We are satisfied that the hearing justice properly rejected the testimony elicited from Hazard and his family, which was riddled with inconsistencies and mendacities, and chose to believe Oddo's recollection of these events.

The hearing justice also concluded that the applicant deliberately failed to make a timely disclosure of the traffic stop for the purpose of avoiding any investigation, at or near the time of the stop, that seemingly would establish that he was not in the vehicle and place him, by inference, in Rhode Island at the time of the murder. Simply put, this Court will not fault counsel for his client's deliberate attempt to withhold potential exculpatory information; *Strickland* does not require counsel to figure out why the client is not forthcoming. Accordingly, Oddo's failure to develop the lead that the applicant may or may not have provided about the traffic stop does not rise to the level of constitutionally deficient assistance of counsel. Because the applicant has failed to show that Oddo's performance fell below the objective standard of reasonableness, we need not reach the remaining prong of the *Strickland* test.[8]

7. Also noteworthy is the fact that applicant was on trial for murder, for which, as he conceded, he faced life in prison—a penalty that far outweighed the potential jail time, if any, he might face for driving on a suspended license for a fourth time.

8. Were we to reach the merits of the prejudice prong, it is doubtful that Hazard would have succeeded in his quest for a new trial. With the exception of the testimony provided by Hazard and his family, there is no independent evidence that places Hazard in the rental car at the time it was pulled over.

## Conclusion

For all the foregoing reasons, we affirm the judgment denying post-conviction relief. The papers may be remanded to the Superior Court.

Indeed, the records of the New Jersey state police indicate that Kyle Hazard was the driver and that two African–American men were the passengers. Although this establishes that a car was stopped in New Jersey, it does not prove that applicant was in it.